6 Wh 418
30 SC 500                    [PHILADELPHIA, APRIL 24TH, 1841.]

KING and Another *against* RICHARDS and Another.

IN ERROR.

The defendants were common carriers of goods between New York and Philadelphia, and had signed a receipt for certain goods as received of A., which they promised to deliver to his order. In trover by the indorsees of this paper, who had made advances on the goods, it was *held*, that the defendants might prove that A. had no title to the goods; that they had been fraudulently obtained by him from the true owner; and that upon demand made, they had delivered them up to the latter.

ERROR to the District Court for the City and County of Philadelphia.

This was an action of trover in the court below, brought by Benjamin W. Richards and Joseph Bispham, trading under the firm of Richards & Bispham, against Charles King and Francis King, trading as C. & F. King, to recover the value of 100 bags of coffee.

The defendants pleaded the general issue; upon which the cause came on for trial before STROUD, J., on the 10th of April, 1839, when the plaintiffs called one George B. Jones, who testified as follows:

"I am in the employ of Richards & Bispham; was so in 1836; this is the signature of L. Clapier Heyl and Company. [Bill of lading exhibited to witness.] I called with this bill of lading on the defendants, on the 22d or 23d of November, 1836, for the production of the coffee. I saw one of the Messrs. King—Mr. F. King, I think; he said that 80 bags of the coffee had been taken away; I tendered the freight, if not at that time, a day or two afterwards; no portion of the coffee was delivered; the average weight of Cuba coffee of this description is 160 lbs., price 12½ cents."

Cross-examined.—" The advance was $1744 in a note, at 60 or 90 days."

Examined in chief.—" The advance was made 21st November, 1836; [notes produced;] these are the notes; this is the bill of lading; [bill of lading produced;] Mr. Walsh was the partner who endorsed it."

The bill of lading and the notes were then read.

The following is a copy of the bill of lading:

Marks & Numbers. } " Steam Tow Boat Company:—Merchants' Transportation Line between New York and Philadelphia, via Delaware and Raritan Canal, for the conveyance of merchandise, specie, baggage, &c., and insurance effected whenever required on any package to its full amount of value."

" Marked R. Proprietors. } Miller and Bancker, No. 16 Washington st., or No. 32 South Front st., New York. C. & F. King, 19 S. Wharves, Philada."

" Received from L. Clapier Heyl & Co., on board the 'tow-boat Orb, the following goods, viz. one hundred bags coffee marked and numbered as per margin, which we promise to forward [danger of navigation, fire, breakage, leakage and other unavoidable dangers and accidents excepted; and not holding ourselves responsible if lost, stolen or damaged beyond the value of two hundred dollars per package, unless insured by mutual agreement, and no damage allowed without being notified twelve hours after delivery] to order in Philadelphia, upon presenting this receipt at our office, No. 19 South Wharves, and paying freight therefor, 12½ cents per 100 lbs.

For the proprietors A. H. Higham."

" Contents and conditions unknown." Endorsed, " L. Clapier Heyl and Company."

"I tendered a check for $40 to cover freight; had no bill of freight; made no question about freight."

The counsel for the defendants then called one Daniel Curtis, Jr., and offered to prove by him, that the coffee mentioned in the receipt or bill of lading signed by the defendants, was the property of John B. Lasala, a merchant of New York, and was so at the time the receipt was signed: that before the defendants had any notice of the assignment of the bill of lading to the plaintiffs, the coffee had been claimed by the said John B. Lasala, as his property, alleging that the same had been fraudulently taken out of his possession, by the said L. Clapier Heyl & Co., and that the defendants had delivered the coffee to Lasala; and that defence in this suit was now taken by him. They further offered to prove by the same witness, that the coffee had been agreed to be sold by Lasala, to the said L. C. Heyl & Co., upon certain conditions being complied with; that the said conditions had not been complied with; that there had been no

delivery of the coffee by the said Lasala to the said L. C. Heyl &
Co., nor was possession of the coffee parted with by said Lasala;
that the said L. C. Heyl & Co., fraudulently took possession of the
same; that the whole transaction on the part of L. C. Heyl & Co.
was fraudulent, and that by the use of ordinary diligence, the plain-
tiffs might have ascertained all these facts before they advanced
money on or took an assignment of the bill of lading.

To which testimony, the plaintiffs' counsel objected; and the
judge sustained the objection and rejected the testimony; to which
the counsel for the defendants excepted.

The judge then instructed the jury, that the defendants could not
dispute the plaintiffs' title; that it was like the case of landlord and
tenant, or mortgagor and mortgagee; that it might be assumed that
the sale by Lasala to Heyl & Co. was conditional, and the conditions
not complied with; that there had been no delivery of possession of
the coffee. This would make no difference; that in this suit such
facts would have no operation; and that the jury must find for the
plaintiffs.

The defendants' counsel excepted to this opinion; and the jury
having found for the plaintiffs the value of the coffee, this writ of
error was taken, and the following errors were assigned:

"1. That the court below erred in rejecting the testimony of
Daniel Curtis, a witness produced on the part of the defendants
below, to prove the facts set forth in the bill of exceptions.

2. That the judge erred in instructing the jury that the defendants
could not dispute the plaintiff's title; that it was like the case of
landlord and tenant, or mortgagor and mortgagee; that it might be
assumed that the sale by Lasala to Heyl & Co. was conditional, and
the conditions not complied with; and that there had been no delivery
of possession of the coffee; this would make no difference; that in
this suit such facts would have no operation; and that the jury must
find for the plaintiffs."

Mr. *Davis* and Mr. *James S. Smith*, for the plaintiffs in error, cited
*Story on Bailments*, 371, § 582. *Taylor* v. *Plumer*, (3 *Maule & Selw.*
562.) *Wilson* v. *Anderton*, (1 *Barn. & Ad.* 450; 20 *Eng. Com.
Law Rep.* 426.) *Hart* v. *Allen*, (2 *Watts*, 117.) *Hand* v. *Baynes*, (4
*Wharton*, 215.) *Berkley* v. *Watling*, (7. *Ad. & Ellis*, 29; 34 *Eng.
Com. Law Rep.* 22.) *Haddon* v. *Parry*, (3 *Taunt.* 303.) *Barrett* v.
*Rogers*, (7 *Mass. Rep.* 297.) *Forrester* v. *Dodge*, (12 *Mass. Rep.*
565.) *Ogle* v. *Atkinson*, (5 *Taunt.* 759; 1 *Eng. Com. Law Rep.*
255.) *Abbott on Shipping*, 381 et seq.; 2 *Leigh's Nisi Prius*, 483.
*Starkie's Evid.* pt. IV., 308. *Maryland Ins. Co.* v. *Ruden*, (6
*Cranch*, 338.) *Del. Ins. Co.* v. *Hogan*, (3 *Wash. C. C. Rep.* 5.)

(King v. Richards.)

Mr. *Meredith*, for the defendants in error, cited 3 *Esp. Rep.* 114. *Hawes* v. *Watson*, (2 *Barn. & Cres.* 540; 9 *Eng. Com. Law Rep.* 170.) *Miles* v. *Cattle*, (6 *Bingh.* 743; 19 *Eng. Com. Rep.* 219.) *Stonard* v. *Davis*, (2 *Camp.* 343.) *Dyer* v. *Pearson*, (3 *Barn. & Cres.* 38; 10 *Eng. Com. Law Rep.* 13.) *Copland* v. *Bousquet*, (4 *Wash. C. C. Rep.* 596.) *Parker* v. *Patrick*, (5 *Term Rep.* 175.) *Irving* v. *Motley*, (7 *Bingh.* 543; 20 *Eng. Com. Law Rep.* 238.) *Mackinley* v. *M'Gregor*, (3 *Wharton*, 396.) *Burnside* v. *Miskelly*, (5 *Watts*, 506.) *Haggerty* v. *Palmer*, (6 *Johns. Ch. Rep.* 437.)

The opinion of the court was delivered by

KENNEDY, J.—The only question raised in this case is, whether the defendants, the bailees of goods delivered to them as common carriers, to be transported from the city of New York to the city of Philadelphia, ought to be permitted to show, in an action brought by the bailors or their assignees, that the bailors had no right to the goods whatever; that they had obtained the possession of them fraudulently from the true owner without his consent; and that upon demand made of the goods by the latter, the defendants below, who are the plaintiffs in error here, had delivered them to him.

In *Rolle Abr.* 606, tit. Detinue, it is said, if the bailee of goods deliver them to him who has the right to them, he is still notwithstanding chargeable to the bailor, who in truth has no right; and for this 9 Hen. 6, 58, is cited. So if the bailee deliver them to the bailor in such case, he is said not to be chargeable to the true owner thereof, Ibid. 607; for which 7 Hen. 6, 22, is cited. And again, in *Fitzherbert's N. B.* 138–9, tit. Writ of Detinue, M., it is laid down, if a man have goods delivered to him to deliver over to another, and afterwards a writ of detinue is brought against him who hath right unto the goods; now if the defendant, *depending the action*, deliver the goods over to whom they were bailed to him for to deliver, the same is a good bar in the action, because he hath delivered them according to the bailment made unto him. But it is said, if I deliver a deed to A., to which B. hath right, and A. dies, and his executor takes the deed, he is not chargeable in detinue to me, but only to B., who hath the right, because he comes to it by law. 1 *Rolle Abr.* 607, tit. Detinue, for which 9 Hen. 6, 58, is quoted. The reasoning, which we meet with in support of these several positions, is by no means satisfactory; nor yet in accordance, I apprehend, with analogical principles. In 1 *Bac. Abr.* 369, tit. Bailment (A) the reason assigned why C., to whom the goods of A. were bailed by B., must not deliver them to A. the real owner is, that C. cannot pretend to remove or alter that possession committed to him, in order to restore it to the right owner; for the right of restitution must be *demanded of him that did the injury,* of which C. has no pretence to judge; and therefore it would be downright treachery

(King v. Richards.)

in him to deliver them to any other than him from whom he had it. Here the proposition that the right of restitution must be demanded of him that did the injury, because the bailee may not know or have the means of ascertaining the owner, if correct, would go to show that in no case can there be a recovery by the rightful owner of goods against him to whom they have been delivered, upon a sale or otherwise, by one who has taken them tortiously without the owner's consent, and without the least colour of right, because the vendee or bailee in such case may not know, or have it in his power to ascertain with certainty, who is the rightful owner of the goods. But recoveries by the right owners of goods against bailees and vendees, and especially the latter, are common and of almost daily occurrence in our courts. As against the purchasers of goods, from those who have come wrongfully by the possession of them, I do not understand it to be denied that a recovery may be had by the owners thereof; and that it is no plea for such purchasers to allege that they purchased the goods, believing the parties, of whom they purchased, to be the true owners thereof, either from the circumstance of their being in the actual possession of them, or that of any other. Indeed it is well settled in England, that the sale of goods, unless made in market overt, if made without the authority of the owner, either expressly or impliedly given, does not divest him of his right of property therein; and that he is entitled to demand and recover the goods or the value of them, from the person in possession of them, whomsoever he may be. 2 *Blackst. Com.* 449, 450. 2 *Inst.* 713, 714. The law is the same in this state, with the exception that we have no market overt; and consequently no protection can be afforded upon this ground in any case to the purchaser. *Hosack* v. *Weaver*, (1 *Yeates*, 478.) *Thomas* v. *Hess*, cited 1 *Yeates,* 479. *Handy* v. *Metzgar*, (2 *Yeates*, 347.) *Easton* v. *Worthington*, (5 *Serg. & Rawle*, 130.) *Lecky* v. *M'Dermott*, (8 *Serg. & R.* 500.)

Would it not, then, be singularly strange and unreasonable to hold that a bailee, a mere depository for instance, who has given no consideration, and parted with nothing for the goods, stands in a more favoured situation than an innocent vendee who has paid a full price for them? Bailees, with the exception perhaps of innkeepers, common carriers, and wharfingers, or warehousemen, have the same right to decline becoming such that vendees have, and may, therefore, by using proper precautions, make themselves secure against loss accruing from their taking charge of goods belonging to others, from whom they have been filched or improperly taken. And although innkeepers, common carriers, wharfingers, or warehousekeepers, may be bound, the first to receive the goods in the possession of their guests, when they have room for them, and the latter the goods in the possession of those who may wish to employ them, by placing the goods in their charge, without having sufficient time allowed to make the requisite inquiry to ascertain first whether they

are the rightful owners of the goods or not; yet that would not seem to furnish any sufficient ground for their refusing to deliver the goods to the owners, on demand made by the latter, where they have been wrongfully deprived of the possession of them. It is sufficient in such cases for the bailees just mentioned that they are authorised by law to retain the goods in their possession without delivery, until they are paid or tendered the amount of what they are entitled to for keeping or carrying them. *Anon.* (2 *Shaw,* 161,) *Yorke* v. *Greenough,* (2 *Ld. Raym.* 866;) and the case of the *Exeter Carrier,* cited in *Yorke* v. *Greenough,* p. 857. In the two last cases cited, the only objection made to the plaintiff's recovery was his omission or refusal to tender or pay the hire claimed by the defendant, which the plaintiff alleged he was not bound to do, inasmuch as his goods had been wrongfully taken from him and delivered to the defendant by a person who had no right thereto or authority whatever to do so. The court, however, held, in the first of these two cases, that the defendant, who was an innkeeper, had a lien upon the plaintiff's horse for his keeping, and was not bound, therefore, to deliver the horse to the plaintiff, though he was the owner, until paid for the keeping of the same; and, in the second case, that the carrier, who was the defendant, had a lien upon the goods for his carriage of them, notwithstanding they were delivered to him by one who possessed himself of them wrongfully without any right thereto, because he was bound to receive the goods, and was therefore justified in withholding them from the plaintiff, who proved himself to be the rightful owner thereof, until he was paid his freight. But in neither of these cases does it seem to have entered into the minds of the counsel or of the court that the plaintiff was not entitled to recover, because the defendant was under a promise or obligation to deliver the goods to his bailor. On the contrary, it seems to have been considered that his title to recover was quite clear, had he only, anterior to the commencement of his action, tendered to the defendant the money due for the keeping of the horse in the one case, or the sum due for the freight of the goods in the other. Besides, it is impossible not to see that in many instances, which occur almost daily, I would say, that if the right of restitution must be demanded by the owner of the goods, in such case, of him who did the injury, or, in other words, of him who wrongfully took them, his remedy to follow the wrongdoer, may cost him more than the value of the goods; or the wrongdoer, when overtaken, may be insolvent, and unable to make compensation. The owner, therefore, in every case, rather than encounter such a risk, where he has been deprived of the possession of his goods wrongfully, by one who has delivered them to a bailee, had better adopt the remedy sanctioned by the court in *Shelburg* v. *Scotsford,* (*Yelv.* 23.) There the owner by force and arms, and against the will of the bailee, retook his horse, which the bailor, without any consent or authority from the owner,

(King v. Richards.)

had lent to the bailee to ride to Y., upon his promise to return the
horse on a certain day agreed on between them; and in an action
brought by the bailor against the bailee, for breach of his promise,
in which the latter pleaded the true property of the horse to be in
J. S., and that he *vi et armis et contra voluntatem*, had retaken the
horse; the matter thus alleged in the defendant's plea was held to
be a good defence; for in law it discharged the promise of the
defendant by reason of the property of the horse being in J. S. This
case establishes the principle clearly that the bailee can no more
resist the right of the true owner to take or recover the possession
of the goods than his bailor could: that the right of property is
ever to be regarded, and may be inquired into in an action brought
by the bailor against his bailee as well as in other cases. And hence
it is that in every case almost, where it is clear that the plaintiff is
not only vested with the right of property in the goods, but likewise
with the right to the possession of them, the general, if not the
universal rule, seems to be, when this is so, and there has been a
conversion of the goods by the defendant, that the plaintiff may main-
tain trover for them. *Mather* v. *Trinity Church*, (3 *Serg. & Rawle*,
512, 513.) *Gordon* v. *Harper*, (7 *Term Rep.* 9.) So replevin will
lie in this state by the owner of goods against any one in the pos-
session of them, who detains them without the sanction either of the
owner, or the law authorising him to do so. *Weaver* v. *Lawrence*,
(1 *Dall.* 157.) *Shearick* v. *Huber*, (6 *Binn.* 3.) *Woods* v. *Nixon*,
(*Addis.* 134.) *Stoughton* v. *Rapalo*, (3 *Serg. & Rawle*, 562.) *Stiles*
v. *Griffith*, (3 *Yeates*, 82.) But if the doctrine as laid down in
*Rolle's Abridgment*, and *Fitzherbert*, *N. B.* were to prevail, neither
replevin nor trover could be maintained by the owner of the goods,
who was not the bailor, though he never had parted with his right
of property or possession in them, against a bailee, because the latter
could defeat the action at any time during its pendency by deliver-
ing the goods to the bailor, who might run away with them, so as to
deprive the owner of all remedy for his loss. But it is said that it
would be breach of trust, or an act of treachery on the part of the
bailee, to deliver the goods even on demand to the true owner, not-
withstanding he has received them from a wrongdoer, because he
promised to restore the goods to such wrongdoer. If the bailee in
such case recover the goods from the bailor innocently, under the
impression made by the bailor, that he is the owner thereof, or has
the right to dispose of them in the manner he is doing, and therefore
promises to return the goods to the bailor, it is very obvious that
such a promise ought not to be regarded as binding, because ob-
tained through a false impression, made wilfully by the bailor; and
truth which lies at the foundation of justice, as well as all moral
excellence, would seem to require, in every such case that the goods
should be delivered up to the true owner, especially if he demand
the same, instead of the wrongful bailor. But if the bailee knew at

(King v. Richards.)

the time he received the goods, and made the promise to redeliver them to the bailor, with a view to favour the bailor, that the latter had come wrongfully by them, either by having taken them tortiously or feloniously from the owner, then the bailee thereby became a participant in the fraud or the felony, and it would be abhorrent to every principle of justice that he should be protected under such circumstances against the demand or claim of the owner. This promise, however, of the bailee is said to be binding on him only, and is not such as his personal representatives are bound to regard: and the reason assigned for this is because the goods have come to their possession by operation of law. This doctrine, if it were to be allowed, would certainly be singularly anomalous, and unlike, in its effect, to any other promise recognised by the law as binding.

In order to test it, let us suppose, for instance, that the vendor of goods, after having received the stipulated price for them of the vendee, promised to deliver them, but died before this could be effected; will it be pretended that his executor or administrator would not be bound, if the goods came to his possession, to deliver them to the vendee? Suppose further, that it is discovered by the executor or administrator, while he has the possession of the goods, that the vendor was not the owner of them, and that he had no right whatever to sell them; would it not be his duty to deliver them to the rightful owner, if demanded by him, and not to the vendee? No one can doubt but it would; and yet I apprehend it would puzzle a casuist himself to distinguish this latter case from that of the bailee. In either case the owner is entitled, upon demand, to have his goods restored to him by whomsoever he may be that has possession of them; for *nemo debet rem suam sine facto aut defectu suo amittere.* It is also clear that the wrongful bailor, having no right of either property or possession in the goods, can transmit nothing of the kind by his delivery of the goods to his bailee. It is true there is a position laid down in *Bro.* Tit. Trespass, pl. 256, 329, 359, which would seem to militate against this. There it is said, if A. take the goods of B. illegally, and C. afterwards take them illegally from A., B. cannot maintain an action of trover against C.; for that, by the first taking, notwithstanding it was tortious, the property of B. was divested. But it is said in 1 *Sid.* 431, that A. does not in such case acquire any property in the goods by the first taking, and, consequently, that B. may maintain trover for them against C. This latter proposition is certainly much more agreeable to reason than the former, and ought, therefore, to be regarded as the law on the subject agreeably to the maxims, *Lex est dictamen rationis;* or *lex semper intendit quod convenit rationi.* The counsel for the defendants in error relied also upon a case mentioned by Mr. Erskine in his argument for the plaintiff in *Latouche v. Fowle,* (3 *Esp. Rep.* 114,) which he said was tried before Mr. Justice Gould. The defendant was a carrier, who had goods delivered to

(King *v.* Richards.)

him to be carried from Maidstone to London. While the goods lay at his warehouse, a person came there who said the goods were his, and claimed them from the carrier: the carrier said he could not deliver them; but that if he was indemnified, he would keep them, and not deliver them according to order. An indemnity was given, and the goods, not being delivered according to order, the party by whom the goods were delivered to the carrier, brought an action against the carrier. And Mr. Gould, Justice, on the trial of it, would not permit the carrier to set up any question of property out of the plaintiff; and held, that he having received them from the plaintiff, was precluded from questioning his title, or showing a property in any other person. Upon this statement of the case the correctness of Judge Gould's decision may well be questioned; and it is probable that his decision was grounded upon the appearance of collision between the carrier and the claimant of the goods as owner. And, indeed, it would appear as if Lord Kenyon did not regard it in the same aspect as stated by Mr. Erskine, or, if he did, that he has impugned it by his decision of the case in which it was cited. In the case before Lord Kenyon, the defendant was a warehouseman, to whom the goods then in question had been sent to look at, for the purpose of purchasing them; but having reason to believe that the goods were obtained fraudulently by the person who sent them, he retained them for the right owner. On the trial of the cause, Lord Kenyon permitted the defendant to prove, if he could, that the property of the goods was in other persons, and not in the party who sent them to the defendant; and said, if this were clearly proved, that he should hold it to be a decisive answer to the action. There are also other decisions and judicial dicta repudiating the ancient dicta or cases, in Rolle and Fitzherbert, and the decision of Judge Gould on this subject. In *Wilson* v. *Anderton,* (1 *Barn. & Adolph.* 450; S. C. 20 *Eng. Com. L. R.* 426,) where the captain of a ship, who had taken goods on freight, and claimed to have a lien upon them, delivered them to a bailee, the real owner demanded them of the latter, who refused to deliver them without the directions of the bailor; and it was held, upon its being shown that the bailor had no lien upon the goods, that the refusal by the bailee to deliver was sufficient evidence of the conversion. On the trial of this last case the *nisi prius* decision of Justice Gould was cited for the defendant, and it was contended in his behalf that he was only answerable to his bailor; in reference to which Lord Tenterden, C. J., observed, " If the law be as is contended, there has rarely been a sitting at Guildhall where injustice has not been done ; for the title to goods has been repeatedly tried in actions against warehousemen. A bailee can never be in a better situation than the bailor. If the bailor has no title, the bailee can have none; for the bailor can give no better than he has. The right to the property may, therefore, be tried in the action against the bailee; and a refusal like that stated in this case has al-

(King v. Richards.)

ways been considered evidence of the conversion." So Littledale, Justice, in the same case, in answer to the argument that the relation between bailor and bailee was near like that which existed between landlord and tenant, which precluded the tenant from controverting the title of the landlord, observed, that although a lessee cannot dispute the title of his lessor at the time of the lease, yet he may show that the lessor's title has been put an end to; and, therefore, in an action of covenant by the lessor, a plea of eviction by title paramount, or that which is equivalent to it, is a good plea; and a threat to distrain or *bring an ejectment by a person having a good title,* would be *equivalent to an actual* eviction; so that if the bailor brought an action against the defendant as bailee, the latter might, on the same principle, show that the plaintiff recovered the value of the goods; or that on being threatened with an action by a person who had a good title to the goods, he had delivered them to him. The court of Common Pleas, also, previously to this, were clearly of opinion in *Ogle* v. *Atkinson,* (5 *Taunt.* 759,) where the question was agitated and discussed, whether a warehouseman, receiving goods from a consignee, who had the actual possession of them, to be kept for his use, might, notwithstanding refuse to redeliver them, if they were the property of another, that he might. And Mr. Justice Heath, in noticing this point, remarked in reply to its having been likened to the case of a lessor in ejectment, brought by him against his lessee, to recover the possession of the leased premises, after the lease had been determined, where the lessee is not permitted to set up a right of property, as a defence, in a third person, that this principle was peculiar to the action of ejectment, that he who is intrusted with the possession of land, must deliver it back to his lessor; but the rule extends to no other action. It is, however, true that some of the members of the court, in *Miles* v. *Cattle,* (6 *Bing.* 743; S. C. 19 *Eng. Com. Com. Law Rep.* 219,) seem to think that it is not competent to a carrier to dispute the title of a party who delivers goods to him; but the question did not arise in that case, and no reason for their thinking so is given. And it may be correct enough to hold, where the real owner of the property does not appear and assert his right to it, that the carrier or bailee shall not be permitted, of his own mere motion, to set up, as a defence against his bailor, such right for him. But it would be repugnant to every principle of honesty to say, that after the right owner has demanded the goods of the bailee, the latter shall not be permitted, in an action brought against him by the bailor for the goods, to defend against his claim, by showing, clearly and conclusively, that the plaintiff acquired the possession of the goods either fraudulently, tortiously, or feloniously, without having obtained any right thereto. It is perfectly clear, if it were to be held that he could not, it might, in effect, be securing to the bailor the enjoyment of the fruits of his iniquity, at the expense of an innocent bailee, who had made himself

liable for the goods to the right owner thereof, by his having been induced to receive them from the bailor, under a false assumption by the latter, that he was the owner of them, and in not having delivered them to the owner afterwards, on his demand, through some doubt as to what he ought to do in the case, or misapprehension of what his duty required of him.

The case of *Hawes* v. *Watson*, (*Ryan & Moody*, 6; S. C. 21 *Eng. Com. Law Rep.* 367,) which has also been cited for the defendants in error, determines nothing more than that the vendor of goods cannot exercise the right of stoppage *in transitu*, notwithstanding the vendee has become insolvent, where it would prejudice third persons; such as have, according to the course and usage of trade, upon the faith of the order of the vendor, directing the goods sold to be delivered to the vendee, bought them of the vendee for a full price actually paid. The question whether the bailee may dispute the right of his fraudulent or tortious bailor to the goods, did not arise in the case, nor does it appear to have been passed on. Neither was this question presented or decided in *Stonard* v. *Dunken*, (2 *Camp.* 344,) another case cited for the defendants in error. These cases, therefore, are inapplicable to the one before us, as the errors assigned in it present no question of any kind between vendor and vendee, so that, whether the vendor under any circumstance may rescind the contract for the sale, and countermand the delivery of the goods to the vendee, after he has parted with the actual possession of them, and given an order that they be forwarded to the vendee, is entirely out of the case. The only question in it is, was it competent for the plaintiffs in error, as bailees and defendants in the action on the trial, to show that the bailors of the goods to them, from whom the defendants in error claim by virtue of an assignment, to recover the value of the goods, obtained possession of them fraudulently from the right owner, without a shadow of right thereto on their part. Under the view that has been taken above of this question, and the reasons there set forth, we have been led to the conclusion, that the plaintiffs in error ought to have been permitted, if they could, to have made proof to that effect. Then, seeing the evidence rejected by the court, would, if received, have tended to prove it, we therefore think that the court erred in not receiving it. The evidence, as we conceive, was all important for the defendants in the court below; because, if it were such as would have satisfied the jury that the assignors of the plaintiffs below had no right to the goods, but that they were the property of John B. Lasala, from whom they had fraudulently gotten the possession without his consent, it would have shown clearly that they, had they been the plaintiffs, could not have recovered from the defendants below after the goods had been claimed by Lasala, and more especially after they had been delivered up to him upon his claim. To determine otherwise would be to permit them to take advantage of and profit by

(King *v.* Richards.)

their own wrong; which was practised first upon Lasala, the owner of the goods, in obtaining possession of them from him by means of fraud; and afterwards upon the defendants below, in inducing them to take the goods from New York to Philadelphia, as if they had been the proper owners of them. If it be so, then, that the assignors of the plaintiffs below had no right to the goods, it follows inevitably that they could transfer none by their assignment to the plaintiffs below; for it is impossible in the nature of things, that a man can transfer a right from himself which he has not. The plaintiffs below, therefore, can be in no better situation than their assignors would, had they been the plaintiffs. I do not know that it is necessary to speak of the instrument of writing signed and given by the defendants below when they received the goods. It was called a bill of lading in the argument; but it is not, perhaps, properly such. It contains an acknowledgment of the receipt of the goods, and an engagement to forward them from the city of New York to the city of Philadelphia, and there deliver to the order of the bailors. It cannot be said to contain any admission that the bailors were the real owners of the goods; so that the doctrine of estoppel, mentioned in the course of the argument, has no application to the case. The judgment is reversed; and a *venire de novo* awarded.

> Judgment reversed; and a *venire de novo* awarded.