# Davis & Pugh *versus* Bigler & Son.

1. G. sold lumber to M., who made an immediate contract with G. to run it to market, and it was left with G. until he started to run it; G. on the way sold it to B.  *Held,* that B. could hold it.

2. If a vendee allows the vendor to remain in possession, or after delivery, immediately give him the possession, and the vendor sells the goods to a bonâ fide purchaser for value without notice, the purchaser can hold the goods.

3. Subsequent purchasers of personalty are not within statutes 13 and 27 Elizabeth.

4. A vendee permitting a vendor to remain in possession (the ordinary mark of ownership) enables the vendor to commit a fraud on innocent third persons, and the vendee must bear the loss.

5. In such case *caveat emptor* does not apply.

6. The rule of law that the retention of personal property by the vendor is conclusive evidence of a colorable sale, is a rule of public policy for prevention of fraud and is to be inflexibly maintained.

7. Where goods are intrusted to servants and bailees, the owner does not lose his property by a breach of trust in the mandatory.

8. The vendee having acquired possession under his purchase, must have enjoyed it so long and in such manner as to show that the delivery to him was not merely formal, before he can safely transfer it to the vendor.

9. A subsequent sale of goods by the vendee, and a marking of them as

[Davis v. Bigler.]

his by the second vendee would make no difference, if the goods still remain in the possession of the first vendor.

10. A bailee employed to run timber to market, wrongfully sold it on the way. *Held*, that he had no lien for his hire and expenses.

11. A bailee may transfer his claim, and with it his lien and the possession of the bailment as security; this is an appointment of the assignee to keep possession as his servant.

12. If a party desires an explicit answer to any point, it should be brought to the view of the court directly.

May 17th 1869.　Before Thompson, C. J., Agnew, Sharswood and Williams, JJ.　Read, J., absent.

Error to the Court of Common Pleas of *Dauphin county:* No. 27, to May Term 1869.

This was an action of replevin, commenced October 22d 1866 by James A. Davis and Joseph B. Pugh, partners as Davis & Pugh, against Samuel S. and Caspar S. Bigler, partners as Bigler & Son, for a raft of timber containing about 5000 feet.　The plea was "property."　The evidence for the plaintiff was, that George Griffith, in October 1865, agreed to cut from his own land and deliver to Ebenezer McMasters, at Smith's Dam, on the Susquehanna river, in Indiana county, a raft of timber at ten cents per foot: the timber was delivered, and marked "J. O. M.," McMasters' mark. · In March following, McMasters contracted with Griffith to run the raft to Marietta; it was rafted in two pieces, one run to a place called Weitzel's, and the other to Bell's Lower Dam.　McMasters sold the raft to the plaintiffs; it was delivered to them and marked "D. & P.," their private mark.　In September 1866, McMasters gave to Griffith $18 or $20 on account of the "expense money" for running the raft to Marietta, and told him he would give him the remainder at Bell's the next morning. McMasters did not get to Bell's till 12 or 1 o'clock the next day; Griffith had left, and McMasters did not overtake him; the raft was not delivered at Marietta.　McMasters went in search of the raft, and eventually found it in the defendants' log pond at Harrisburg, with the marks both of himself and the plaintiffs upon it. One of the defendants said they had bought the raft from a man named Dunlap, and not from Griffith, and showed McMasters a receipt from Dunlap for the price.　McMasters testified that he had paid Griffith in full for the raft; the mark "J. O. M." was not his usual mark, but having lost his own marking hammer, he had borrowed and used another with that mark on it.　There was additional evidence of the sale and delivery of the raft to McMasters, and that the defendants purchased it from Dunlap; also that the "expense money" would be from $75 to $100.

Griffith testified for the defendants that he had not sold the raft to McMasters; that he "laid" the raft to a landing which he had rented and for which he paid the rent, and in the spring ran it to Green's Dam, where he sold it to the defendants; that he sold it

himself; Dunlap had nothing to do with the sale. The evidence was very conflicting, and there was evidence against the character for veracity of both Griffith and McMasters; and also of other witnesses. There was no dispute that the defendants had paid for the raft and taken possession of it.

One of the plaintiffs' points was :—

" McMasters having passed his title to the plaintiffs, they thereby acquired the right of possession as well as the right of property, and are entitled to recover in this suit."

The court answered : " This would be so had not Griffith, the former owner, had the lumber all at the time in his possession, or if formally delivered, had the possession immediately restored to him. This point is fully explained and substantially negatived in the general charge."

Pearson, P. J., after referring to the evidence bearing on the sales by Griffith to McMasters and to the defendants, charged :—

" The purchaser can acquire no greater title than existed in the man from whom he purchased. The difficulty in the present case arises from Griffith, the former owner of the timber, having been left in possession of it, first, from spring till fall, then to run to market; and, having made sale of it to the defendants, cannot they, if bonâ fide purchasers without notice, hold it as against McMasters or the plaintiffs ? Every sale of personal property must not only be consummated by delivery of possession, but the same must accompany and follow the sale. If sufficient delivery in law takes place, but the possession is immediately restored to the vendor, and he is permitted to retain it until he sells to a bonâ fide purchaser, the latter will hold the property. [If, then, this timber formerly belonged to Griffith, and he sold it to McMasters, but an immediate contract was made to run it to market, and the raft was left in possession of Griffith, and lay at the landing hired by him until he started to run it to market, and he sold it on the way to the defendants, who bought in good faith, without notice of the sale to McMasters, they will hold it.] The main points submitted to you on this branch of the case are, did the defendants buy from Griffith or from Dunlap, and were the marks on the timber of a character to bring home notice to them that the property belonged to others ? If the purchase was from Dunlap, he had no title, and could pass none. If Griffith was present and really conducted the sale, made the bargain and ultimately received the money, although Dunlap's name may have been used, because he could write and Griffith could not, you may still consider it the sale of Griffith. That question is submitted to the jury. [The marks on the timber, or on the raft, being large and plainly made, or small and obscure, is of no moment in passing the title; but may be of some in bringing home notice to the defendants that Griffith did not own the raft, and lead them to inquiry. The

[Davis v. Bigler.]

object in stamping the logs is not to give title, but to enable the owner himself to know his own lumber,] not to entitle him to recover on account of notice to the purchaser, who, in ordinary cases, buys at his peril.    On this branch of the case the points submitted for your consideration are: 1st. Did Bigler & Son buy from Griffith or Dunlap?    If from the latter they cannot hold. If from the former they can, for the reasons already given.    2d. [Did they buy in good faith, believing Griffith the owner?    If they did, they can hold on account of his having formerly owned the property, and being intrusted with its possession down to the time of sale.]    If they had notice of the want of ownership, or from the marks on the timber had such notice as would put persons of ordinary prudence on inquiry, they cannot claim to be bonâ fide purchasers.

" The small size of the marks on the logs may have prevented their being noticed, and, even if seen, the practice of the lumbermen of using each others' marking hammers, may have caused the marks to be disregarded.

[" Although there is no evidence that Bigler & Son ever saw this timber whilst owned by Griffith, yet they have the right to take advantage of the circumstance of his being intrusted with the property he formerly owned to show that the sale by him was fraudulent in law.]    None of our numerous reported cases on the subject put the invalidity of the sale on the ground that the purchaser was actually *misled*, but such sales are held to be fraudulent under the statute of Elizabeth.    Another position has been taken by the defence: that before issuing the writ of replevin the plaintiffs were bound to tender the amount due for running, or at least the expense money that McMasters agreed to advance to Griffith for that purpose, and which he failed to furnish.

" This would be well taken if Griffith had complied with his contract by running the raft to Marietta; but freight was never earned, for the work was not completed.    On the contrary, if McMasters truly represents the case, the timber was fraudulently sold on the way.    It is said that they could run no further than Green's dam on account of low water; and if such was the case Griffith would be excused from taking it further at the time.    [McMasters was the first to break the contract by failing to furnish the expense money; and although we have great doubt about the soundness of the position, yet, having decided the other and main legal point against the plaintiffs, you are instructed that this expense money should have been tendered before bringing suit.]

" If you believe Griffith, there was no contract on his part to sell the lumber to McMasters; it remained his own, and he had the right to sell it to whomsoever he pleased, and in that event your verdict should be in favor of the defendants."

The verdict was for the defendants.

[Davis *v.* Bigler.]

The plaintiffs having taken out a writ of error, assigned for error the answer to their point and the parts of the charge in brackets.

*E. Snyder* and *B. F. Etter*, for plaintiffs in error.—The continued possession in the vendor is but primâ facie: Edwards *v.* Harben, 2 T. R. 587; Kidd *v.* Rawlinson, 2 Bos. &. Pull. 59; Arundell *v.* Phipps, 10 Vesey 145; Martin *v.* Podger, 2 W. Black. 701; Eastwood *v.* Brown, Ry. & Moo. 312; Martindale *v.* Booth, 3 Barn & Adolph. 505; Chase *v.* Ralston, 6 Casey 539; Morgan *v.* Biddle, 1 Yeates 3. The purchaser acquires no greater title than the seller: McMahon *v.* Sloan, 2 Jones 229. Marking timber is evidence of delivery, and the buyer might contract with the seller to run it to market: Hilliard on Sales 5, note b, 32; Williams *v.* Merle, 11 Wend. 80; Covill *v.* Hill, 4 Denio 323; Easton *v.* Worthing, 5 S. & R. 130; Lecky *v.* M'Dermot, 8 Id. 500; Parsons *v.* Webb, 8 Greenleaf 38; Lickbarrow *v.* Mason, 2 T. R. 63. If there was a lien in favor of Griffith as bailee on the raft for the "expense money," it could not pass by assignment to defendants,—it would continue but while Griffith had possession: Daubigny *v.* Duval, 5 T. R. 604; Gladstone *v.* Birley, 2 Merivale 404; Hillard on Sales 198, note a; Jarvis *v.* Rogers, 15 Mass. 389, 396; Holly *v.* Huggeford, 8 Pick. 73–76. Griffith had no lien because he had failed in his contract: Hogden *v.* Waldron, 9 N. Hamp. 66; 2 Selw. N. P. 1358: Madder *v.* Kempster, 1 Camp. 12; Ex parte Foster, 2 Story 131; McCombre *v.* Davis, 6 East 538; Jordan *v.* Janes, 5 Hammond 88; Allen *v.* Ogden, 1 Wash. C. C. R. 174; Jenkins *v.* Eichelberger, 4 Watts 121; Picquet *v.* McKay, 2 Blackf. 465.

*L. B. & Hamilton Alricks*, for defendants in error.—Lumber marks should be registered, Act of April 10th 1862, P. L. 383, Purd. 1278. The sale to McMaster was fraudulent under statute 13 Elizabeth: Roberts' Dig. 294; Clow *v.* Woods, 5 S. & R. 278; Barr *v.* Reitz, 3 P. F. Smith 256; Shaw *v.* Levy, 17 S. & R. 99; Lanfear *v.* Sumner, 17 Mass. 110; Jenkins *v.* Eichelberger, *supra;* Young *v.* McClure, 2 W. & S. 147; McBride *v.* McClelland, 9 Id. 94; Mitchell & Lucas, 1 Wright 187; Mott *v.* McNiel, 1 Aik. Rep. 162. No title passed till delivery: 1 P. F. Smith 66. As to tender of expenses: Hoover *v.* Epler, 2 P. F. Smith 522; Hartjie *v.* Collins, 10 Wright 268.

The opinion of the court was delivered, July 6th 1869, by

SHARSWOOD, J.—The main contest in the court below was upon questions of fact. The original owner of the raft and his alleged vendee, were both examined as witnesses, the parties to the suit being purchasers from them respectively. Their testimony was

[Davis v. Bigler.]

conflicting upon the most important questions in issue,—the fact of a sale and delivery—the retention of possession by the vendor if there was a sale, and the explanation of the marks on the logs. It is not the province of a court of error to review the verdict. The responsibility of that rests with the court before which the trial took place, and most wisely rests there: for they heard all the testimony from the lips of the witnesses, while all that is presented here are notes of the evidence, necessarily imperfect. It is our duty to dismiss from our minds all considerations arising upon the weight of the evidence, and confine ourselves to the errors of law alleged to have been committed, and which form the subject of the several assignments. These it is proposed to take up and examine, *seriatim*, in their order.

The first error assigned is that the learned judge below instructed the jury that if "this timber formerly belonged to Griffith, and he sold it to McMasters, but an immediate contract was made to run it to market, and the raft was left in possession of Griffith, and lay on the landing hired by him until he started to run it to market, and he sold it on the way to the defendants, who bought it in good faith, without notice of the sale to McMasters, they will hold it." That on the facts assumed in this instruction the law is correctly stated can hardly admit of a doubt. It is the doctrine of Shaw v. Levy, 17 S. & R. 99,—which remains unshaken in this state,—that if a vendee allow a vendor to remain in possession or after a formal delivery immediately restore the possession to him, and he afterwards sell and deliver the goods to a bonâ fide purchaser for value, without notice of the prior sale, such purchaser is entitled to the goods against the first vendee and all claiming under him. It would seem, however, to be a mistake to suppose that this rule depends either upon the statute of 13 Elizabeth c. v., or the statute 27 Elizabeth c. iv. The former of these statutes declared void all grants, as well of lands and tenements as of goods and chattels, made to delay, hinder or defraud creditors or others of their just and lawful actions, suits, debts, accounts, damages, penalties, forfeitures, heriots, mortuaries and reliefs as against the parties entitled to the same. It is evident that subsequent purchasers are not within its purview. The statute 27 Elizabeth c. iv., for the protection of purchasers, is expressly confined to "all and every conveyance, grant, charge, lease, estate, encumbrance and limitation of use or uses of, in, or out of any lands, tenements or other hereditaments whatsoever." Roberts' Dig., pp. 295, 298. These statutes have been more than once declared by very high authority to be merely declaratory. "The principles and rules of the common law as now universally known and understood," said Lord Mansfield, "are so strong against fraud in every shape, that the common law would have attained every end proposed by the statutes 13 Elizabeth c. v., and 27 Elizabeth c. iv."

Cadogan *v.* Kennett, Cowp. 434; Marshall, C. J., in Hamilton *v.* Russel, 1 Cranch 316; Story, J., in Meeker *v.* Wilson, 1 Gall. 423; 2 Kent Com. 515.   The principle upon which Shaw *v.* Levy rests is this, that the vendee by suffering the vendor to remain in possession, as to personal property the ordinary *indicium* of ownership, thereby enabled him to commit a fraud upon innocent third persons, and in a contest between them he must bear the loss who has been the cause of it.   " I do not consider," said Mr. Justice Rogers, " that this principle depends upon a secret trust between the original parties, but on public policy and the sound maxim of morality and law, that where one of two innocent persons must suffer, he who is the cause of the loss must bear it. Wherever there is a sale of property, and no actual possession delivered, it remains at the risk of the purchaser; as between him and the vendor the property is his, but when it passes into the hands of a bonâ fide purchaser without notice, it would be against sound policy to permit a recovery.   The maxim *caveat emptor* does not apply."   The same view has been advanced by the Supreme Court of Connecticut.   The rule of law that the retention of possession of personal property is conclusive evidence of a colorable sale is a rule of policy required for the prevention of fraud, and is to be inflexibly maintained.   Therefore where a vendor of a horse within a week after the sale hired him of the vendee and was using him to all appearance as his own in the same manner as before the sale, it was held that it was a restoration of the possession : Webster *v.* Peck, 31 Conn. 495.   Wherever the owner of goods stands by, and without objection allows another to treat them as his own, and a third person is thereby led to purchase them in good faith, he cannot recover from the purchaser on the familiar principle of estoppel; and the same doctrine applies, although the party who allows another to assume the credit of ownership is not actually present when the act is done by which the third party is deceived : Gregg *v.* Wells, 10 Ad. & Ell. 90; Thompson *v.* Blanchard, 4 Comst. 303.   In the every day transactions of life men are under the necessity of intrusting the possession of goods to servants and bailees for various purposes. The owner does not in such cases lose his property by a breach of trust in the mandatory, where there is no sale in market overt : Lecky *v.* McDermott, 8 S. &. R. 500; King *v.* Richard, 6 Whart. 422; Rapp *v.* Palmer, 3 Watts 178; McMahon *v.* Sloan, 3 Jones 231.   Allowing a person therefore to have actual possession of chattels, unless there is some other fact connected with it, is not an act which holds him out to the public as owner or as authorized to sell it as his own.   The doctrine of *caveat emptor*, as to any title the purchaser may acquire applies : Brown *v.* Wilmerding, 5 Duer 225.   But when the possession remains in the original owner, or after a formal delivery it is restored without

any notorious break in the continuity of it, under a secret understanding or agreement with him as servant, agent or bailee, this is an element which makes a very important difference in the case. That inquiry, which the party dealing with the possessor is bound to make, and which the law presumes him to make, leads him back to the original title, and thus his diligence will only avail to confirm the deception.   The vendee having acquired possession under his purchase, must have enjoyed it as long and in such a manner as to show that the delivery to him was not merely formal or colorable, before he can safely transfer it back to the vendor: Breckenridge v. Anderson, 3 J. J. Marshall 714; Jarvis v. Davis, 14 B. Monroe 529; Stevens v. Irwin, 15 Cal. 503.

It is urged, however, that the error of the instruction complained of in this assignment consists in this, that it left out of view the fact in evidence that the vendee had resold to the plaintiffs, who had stamped the timber with their mark, and such being the case, it was competent for the original owner to have possession under a contract to run it to market, communicated to the new purchaser, and a sale by the bailee, under such circumstances, could in no manner affect the title of the plaintiffs.   It might be enough to say, as to this suggestion, that if the law were as contended, it should have been embodied in a written point, and the specific instruction of the court upon it requested; for "it is hardly possible for any court to charge in such language as to comprehend every possible point of view in which the case might be put, or to notice every exception to the general rules of law. If the party wishes an explicit answer in relation to any particular point, it ought to be brought to the view of the court directly." Sergeant, J., in Churchman v. Smith, 6 Whart. 152. That a mere omission of a judge to charge on a particular aspect of a case is not error when his attention is not called to it with a request so to charge, is the well-established law and practice of this court, as settled in a long line of cases, from Churchman v. Smith to Walker v. Humbert, 5 P. F. Smith 407.   But even conceding, which the case indeed does not warrant, that the negative of such a proposition is fairly to be implied from the language of the learned judge, it is not easy to see upon what principle or reason the subsequent sale and marking could make any difference—the possession remaining all the while in the original owner.   This was the hypothetical fact upon which this instruction was based, and whether the fact was so was left to the jury to say.   Every sale subsequently made, even supposing the original owner to have been a party to it, was but a repetition of the first transaction, by which the vendor, being put in full possession under a secret contract, was thereby enabled to commit a fraud upon others.  If the plaintiffs had been the hundredth in a regular line of succession as vendees, it would not in the least have strengthened their title.

[Davis *v.* Bigler.]

Every succeeding vendee leaving the original vendor in possession, stepped into the shoes of the first vendee; and of each one it may be predicated that though he may himself be innocent, yet as the cause of the loss sustained by another equally innocent party, he shall bear that loss.

The 2d assignment of error is as to the instruction of the court below in reference to the legal effect of the marks of the first and second vendees on the logs composing the raft. It is to be observed that these marks were not registered, so that we have not to consider the operation of the Act of April 10th 1862, Pamph. L. 383. That such marking was a sufficient constructive delivery, and had the lumber simply remained where it was until the time came for rafting it to market, it could not have been levied on by the creditors of the vendor, or sold by him even to a bonâ fide purchaser, would seem to be settled in this state by Chase *v.* Ralston, 6 Casey 539. But the marks not duly registered were only evidence, of such delivery, and if immediately thereupon actual possession was redelivered to the vendor with authority to run it to market, the fact of their being on the logs could only be regarded as evidence of notice, or as a circumstance to put the purchaser upon inquiry. There were two sets of marks, the first confessedly not the mark of the original vendee, but a borrowed stamp. "If," said the court, "the defendants had notice of the want of ownership, or from the marks on the timber had such notice as would put persons of ordinary prudence on inquiry, they cannot claim to be bonâ fide purchasers." We perceive no error in this.

The 3d assignment is, that the court erred in leaving the question of the bona fides of the defendants as purchasers to the jury, which it is contended had nothing to do with the case. But if the jury should find the fact to be that the original vendor had been continuously in possession from the period of the first sale down to the purchase by the defendants, which was the turning point of the whole controversy as we have seen, then their bona fides was certainly a very material inquiry. This instruction is of course based upon the supposition that the jury should believe the evidence given on the part of the plaintiffs to prove that there had been a sale and delivery by Griffith to McMasters. If there had not been, they unquestionably had shown no title to recover, whether the defendants were bonâ fide purchasers or not. But if there really had been such a sale, and the possession remained in Griffith, a sale by him to a bonâ fide purchaser would give a title superior to that of the original vendee, McMasters, and the plaintiffs claiming under him.

The 4th assignment of error is, that the court erred in their answer to the plaintiff's 3d point. This point assumed the facts, instead of being as it ought to have been in a hypothetical form,

and it would therefore have been manifest error to have affirmed it. The plaintiffs cannot complain, then, that the court answered it by saying " that it would be so, had not Griffith, the former owner, had the lumber all of the time in his possession, or, if formally delivered, had the possession immediately restored to him. This point is fully explained and substantially negatived in the general charge." But in the general charge this fact which appears in this answer to be assumed, is clearly and distinctly submitted to the jury, so that they could not possibly mistake the meaning and effect of this language.

The 5th assignment of error is to so much of the charge as instructed the jury that it was unnecessary that the defendants should prove affirmatively that they knew that Griffith was the original owner of the timber when it was cut and prepared for rafting. We think the court was right in this instruction. If we recur to the original ground of the rule, as has been before stated, it was that McMasters, by leaving Griffith in possession, had enabled him, with this *indicium* of ownership, to direct the inquiry of the defendants to the fact, which was undisputed, that he was the owner of the land upon which the timber originally grew. The law presumes that the purchaser acted on his personal knowledge or made due inquiry. In nine cases out of ten it would be impossible for him to give evidence of this knowledge or inquiry. To require it in every case would be practically to abrogate the rule altogether.

We think, however, that the 6th error assigned must be sustained. Nothing seems to be better settled than that considering Griffith as a mere bailee—employed to carry the lumber to market—he forfeited all lien for the hire and expenses, if he ever had any, by his wrongful sale to the defendants. He was not a factor to sell within the provisions of the Act of Assembly of April 14th 1834, Pamph. L. 375. A bailee may indeed transfer his claim, and with it his lien and the possession of the thing, as security for his claim, for that is a rightful act, and indeed amounts to a mere appointment of the assignee to keep possession as his servant or attorney, and the lien is not thereby extinguished, for the possession still continues properly to be the possession of the bailee. That was the principle of Hoover *v*. Epler, 2 P. F. Smith 522, where a groom having paid a farrier's bill for shoeing a horse, was entitled to his lien. But it is entirely different where there is a wrongful sale or pledge by the bailee of the thing itself. That puts an end to his possession, and with it his lien. It is a conversion both by him and the party to whom he so wrongfully transfers the title : Story on Agency, § 367, and the cases there cited. Under the positive direction on this point, given by the learned judge below, the jury may have found their verdict for the

[Davis *v.* Bigler.]

defendants, although they may have been with the plaintiffs on all the other questions in the cause.

Judgment reversed, and *venire facias de novo* awarded.