NATIONAL NEWARK BANKING COMPANY, DEFENDANT IN ERROR, v. DELAWARE, LACKAWANNA AND WESTERN RAILROAD COMPANY, PLAINTIFF IN ERROR.

Argued March 2, 1904—Decided June 20, 1904.

Cars of grain were consigned to one Archer at Newark. Prior to their arrival he contracted to sell them to different purchasers, and surrendered the bills of lading to the local freight agent at Newark. Upon the surrender of the bills of lading he presented orders directing delivery of the cars to the several purchasers, "or ourselves or order, on presentation of this order." Upon these orders the local freight agent stamped the words, "Car to be delivered on this order, same as B. of L. B. of L. taken up at Newark." Archer retained the orders thus certified, drew upon the purchasers for the price of the grain payable on arrival, and obtained advances from the plaintiff bank upon the drafts accompanied by the certified orders. *Held*—

1. The contract between the purchaser and Archer was an executory contract, and not a present bargain and sale.

2. The transaction with the bank transferred to it a title to the grain.

3. A carrier must deliver goods to the true owner, claiming under the consignee, when it has notice of the true owner's rights, and the bill of lading has already been surrendered.

4. The certified order in this case amounted to notice of the bank's rights.

5. Notice of the rights of a person claiming title under consignee to have the goods delivered to him when given to the agent of the carrier charged with the duty of delivering freight, is notice to the carrier.

On error to the Supreme Court. This cause was tried at the Essex Circuit before Chief Justice Gummere and a jury, and a verdict directed for the plaintiff below.

For the plaintiff in error, *Robert H. McCarter.*

For the defendant in error, *Richard V. Lindabury* and *John O. H. Pitney.*

The opinion of the court was delivered by

SWAYZE, J. This is an action of trover. As finally presented to the trial court, the controversy was limited to eight cars of grain, which had been consigned to one Archer, trading as A. E. Howe & Co. Archer, in pursuance of a practice continued for several years, had surrendered the bills of lading to Remer, freight agent of the defendant at Newark, prior to the arrival of the grain, and had received in exchange therefor what are called "certified orders." The case turns upon the validity and effect of these certified orders. They were in the following form:

"NEWARK, N. J., Aug. 18th, 1902.
"Agent D. L. and W. R. R.

"On arrival of car oats No. 12043 or its transfer, please deliver same to J. R. Bradner & Son, or ourselves or order, on presentation of this order.

"A. E. HOWE & Co.

"Freight paid.
"Invoice, No. 47143."

Upon surrender of the bill of lading the cashier in Remer's office stamped across the face of the order the following words:

"Car to be delivered on this order same as B. of L.

"B. of L. taken up at Newark.

"JOHN REMER, *Agt.*

"Per J. H. BURRELL, *Cashier.*"

Archer had contracted to sell the grain in advance of its arrival and the name of the purchaser was inserted in the order.   After the order was stamped by Burrell, Archer drew a draft on the purchaser, and upon these drafts, accompanied by the certified orders endorsed by Archer, obtained advances of money from the bank.

. The practice of issuing these certified orders in lieu of the bills of lading arose from the fact that Archer sold grain by the carload at points along the line of the railroad between Dover and Washington and Newark, and in order to avoid having the grain transported through to Newark, its original destination, the bill of lading was surrendered and the car transferred, formerly at Dover but later at Washington, and sent to the station at which it was to be delivered to the customer to whom Archer had agreed to sell it.

In August, 1902, Archer absconded.   The eight carloads of grain now in question had then been delivered by the railroad company to the purchasers from Archer upon his written instructions.   The bank held the certified orders and demanded delivery of the grain, with which demand the railroad company was unable to comply.   The terms of the contracts between Archer and the purchasers of the grain do not appear, but in each case the sale was of grain *en route,* and the drafts drawn upon purchasers by Archer were payable upon arrival of the grain, and the fair inference, in the absence of proof to the contrary, is that Archer was to deliver the grain at Newark.   The contracts of sale between Archer and the purchasers antedated the arrangement made by Archer with the bank, and the arrangement with the bank antedated the arrival of the grain.

A verdict was directed for the plaintiff for the amount advanced on the drafts. ,

The fact that the grain was *en route* and to be delivered by Archer to his customers at Newark, in the absence of other proof as to the terms of their contract, requires the inference that the title to the grain did not pass immediately upon the sale. 1 *Benj. Sales (Corbin's ed.)* 333.

The contract between Archer and the purchaser was an executory contract and not a present bargain and sale. The subsequent arrangement with the bank passed title to the grain. Whether it was an absolute title, or by way of pledge, or by way of mortgage, is, we think, not material to the present case. The arrangement with the bank, by whatever name it may be called, was consummated by the delivery to the bank of the certified orders. The effect of the certified orders, as between the railroad company and the bank, is a question to be hereafter determined upon another branch of the case. but even if invalid against the railroad company, they were symbols of title as between Archer and the bank. The reasons for holding that title passes by a delivery of a symbol of title are well stated by Chief Justice Taney in *Gibson* v. *Stevens,* 8 *How.* 384 (at *pp.* 399, 400) (1850). The documents with which he was there dealing were two bills for goods sold; to one the sellers had added a receipt, stating that they held the goods mentioned therein in store; the other was a mere receipted bill. Upon these documents the purchasers endorsed orders for the delivery of the goods and obtained advances thereon. The Chief Justice said:

"The delivery of the evidences of title and the orders endorsed upon them was equivalent in the then situation of the property to the delivery of the property itself. This mode of transfer and delivery has been sanctioned in analogous cases by the courts of justice in England and this country." After citing cases, he adds: "The rule is not confined to the usages of any particular commerce but applies to every case where the thing sold is, from its character or situation at the time, incapable of actual delivery." Other cases in point are *Ex parte Fitz,* 2 *Low.* 519; *Tuxworth* v. *Moore,* 9 *Pick.* 347; *Carter* v. *Willard,* 19 *Id.* 1; *Pratt* v. *Parkman,* 24 *Id.*

778        COURT OF ERRORS AND APPEALS.

Natl. Newark Bkg. Co. v. D., L. & W. R. R. Co. 70 N. J. L.

42; *First National Bank of Green Bay* v. *Dearborn,* 115 *Mass.* 219; *Merchants' Bank* v. *Hibbard,* 48 *Mich.* 118; *Whitney* v. *Tibbits,* 17 *Wis.* 359; *Barber* v. *Meyerstein, L. R.,* 4 *H. L.* 317; 39 *L. J., C. P.* 187; 4 *Eng. Rul. Cas.* 798; *Young* v. *Lambert, L. R.,* 3 *P. C.* 142; 39 *L. J., P. C.* 21. It is not, however, necessary to hold that the certified orders were symbols of property so that their transfer by endorsement was equivalent to an actual delivery of the goods. There was certainly an agreement between the bank and Archer by which the bank obtained a present right in the grain. *Bryans* v. *Nix,* 4 *Mees. & W.* 775 (*Baron Parke,* at *p.* 790). Whether the title of the bank was absolute, or by way of pledge or mortgage, the action is maintainable, and the measure of damages, whether the property was special or general, is the value of the goods. *Luse* v. *Jones,* 10 *Vroom* 707, 713.

The case presents this situation: A consignee sells goods in advance of arrival and gives an order for their delivery, which is known to the local freight agent of the carrier, and subsequently orders the carrier to deliver the same goods to another person, and the carrier complies with the later order.

There can be no question that if the carrier delivers the goods to the true owner claiming title under the consignee, such delivery is a good delivery. The only question that has arisen as to the carrier's right to deliver to the true owner has arisen in cases where a bailee has delivered to an owner, claiming adversely to the bailor, and it is now well settled by many cases that if the bailee has performed his legal duty by delivering the goods to the true owner, at his demand, the bailee is not answerable to his bailor, and this rule is especially applicable to common carriers, who must carry for all who offer. *Hardman* v. *Willcock,* 9 *Bing.* 382; *Cheesman* v. *Exall,* 6 *Exch.* 341; *Sheridan* v. *New Quay Co.,* 4 *C. B.* (*N. S.*) 618; *Biddle* v. *Bond,* 6 *B. & S.* 225; *S. C.,* 3 *Eng. Rul. Cas.* 572; *King* v. *Richards,* 6 *Whart.* 418; *Western Transportation Co.* v. *Barber,* 56 *N. Y.* 544; *Wells* v. *American Express Co.,* 55 *Wis.* 23; *Wolfe* v. *Missouri and Pacific Railway Co.,*

97 *Miss.* 473; *Shellenberg* v. *Fremont, &c., Railroad Co.*, 45 *Neb.* 487; *Southern Express Co.* v. *Dickson,* 94 *U. S.* 549; *Hentz* v. *The Idaho,* 93 *U. S.* 575.

If the bailee is justified in recognizing the right of the true owner, claiming adversely to his bailor, much more is he required to recognize the right of the true owner, claiming under his bailor, as in this case the bank claims under Archer.

The position of the bank is not merely that of the true owner, for it has an order of the consignee for delivery of the grain, and there can be no doubt that the carrier, having in its possession the bill of lading, if it had not already delivered the grain, must deliver upon that order. The question is whether the carrier is protected by the delivery under the later order.

Although the duty of the carrier requires a delivery to the true owner, when known, it can hardly be disputed that in the absence of notice of a third person's rights, the carrier would be justified in delivering to the consignee, who is *prima facie* entitled to receive the goods, and if it would be justified in delivering to the consignee, it must be justified in delivering on the consignee's order. The rights of the bank depend upon whether the certified orders were orders for delivery to the bank and were known to the railroad company prior to the delivery to the other purchasers.

Those orders, when presented to Remer, directed a delivery either to the purchaser or to Archer, or to Archer's order, "*on presentation of this order.*" The very fact that Archer had the orders stamped with the words "car to be delivered on this order same as B. of L.," and took them away with him, was notice to Remer that some use was to be made of the orders other than merely to direct a delivery by the railroad company. Had such been the only purpose it would have been unnecessary for Archer to have the orders certified or to take them away with him. It would have been enough to leave the bills of lading with the company and afterwards send such instructions for delivery as Archer actually gave in favor of the subsequent purchasers. By cer-

780    COURT OF ERRORS AND APPEALS.

Natl. Newark Bkg. Co. v. D., L. & W. R. R. Co. *70 N. J. L.*

tifying these orders, the agent virtually accepted them. If he was authorized to accept for the company, the company became bound by the acceptance. If he was without such authority, still the terms of the orders gave him notice that the grain was no longer deliverable merely to the consignee or upon his order, but was deliverable only upon the presentation of the certified orders. To that condition the consignee had himself consented, and the railroad company would have been entirely justified in refusing delivery on any other terms. It is true, the certified orders did not name the persons who were to receive the goods, but they described them in such a way that no mistake could be made. The orders amounted to saying: "Deliver the grain to the man who presents this order; it will be either Bradner (or any other purchaser), ourselves, or someone with an order from us." The freight agent, when he endorsed the order, had notice that the grain might not be deliverable to Archer upon its arrival; he also had notice that it should be delivered to someone who would be identified by the possession of the certified order. Such a method of identification was as safe for the railroad company as an identification by name. The agent knew that the person who would be entitled to receive the grain must answer two descriptions: (1) he must have the certified order; (2) he must be either the purchaser named in the order, the consignee himself, or someone with the order of the consignee. The bank complied with both terms of the description; it had the certified order and the endorsement of Archer thereon.

Notice to the freight agent was notice to the railroad company. It was notice to the very person who was charged by the railroad company with the duty of delivering the grain. The bank's right does not rest solely upon a contract made by the freight agent to deliver the grain to the holder of the certified order. Its right depends upon the facts that it was the true owner of the grain, and the holder of the token which the consignee had notified the railroad company was to determine the question to whom the delivery should be made.

The question remains as to the right of the local freight

agent to adopt such a method of identifying the proper person to receive the grain.   As he had, according to the testimony of the division freight agent, the whole charge of receiving and delivering freight, we can see no reason why in the discharge of his duties he might not adopt any reasonable means to identify the persons to whom the goods should be delivered. Certainly, he could agree with the consignee that the grain should not be delivered to any person other than the consignee without the consignee's written order.   That would be merely a prudent method of protecting the railroad company against imposition.   What difference can there be between requiring a written order and requiring a particular written order if the consignee assents to the arrangement?

Whether the company would have been bound if Remer had certified an order not conditioned upon the arrival of the car, and in a case where the grain never reached the railroad company, is a question that does not arise.   These orders were merely for the delivery of the grain upon its arrival.   That delivery was a part of Remer's ordinary duties.

These considerations lead to an affirmance of the judgment.

We have not found it necessary to determine whether a certified order, issued in exchange for a bill of lading, as yet unaccomplished, is not in effect a substituted bill of lading as far as the same is a symbol of the property and transferable by endorsement, nor whether the course of business of the railroad company did not require an inference of Remer's authority to issue such a document of title.

*For affirmance*—THE CHANCELLOR, FORT, HENDRICKSON, PITNEY, SWAYZE, VREDENBURGH.   6.

*For reversal*—DIXON, GARRISON, VROOM, GREEN.   4.