BY THE

ST. LOUIS, KANSAS CITY AND SPRINGFIELD

# COURTS OF APPEALS

AT THE

OCTOBER TERM, 1915.

---

ERNEST WOLFF MANUFACTURING COMPANY, a Corporation, Appellant, v. BATTREAL SHOE COMPANY, a Corporation, and J. F. MEADE, Respondents.

Kansas City Court of Appeals, October 4, 1915.

1. CONVERSION: Damages: Merchandise. Where one is in actual possession of property at the time of the conversion, he is entitled to maintain an action for conversion against a stranger to the title, who takes the property from him, since his possession is presumed to be rightful and it is no defense to show that he had no title. But if not the true owner, the defendant may still defeat the action of a mere naked possessor, if he can in some way connect himself with the owner's title, and the burden is upon the defendant not only to show a better title in some other person, but also his connection with such other person.

2. ————: ————: ————. The delivery of goods by a sheriff at the request of an attachment creditor to a receiver in bankruptcy who thereby took the title from the bankrupt free from attempted preference is a complete defense to an action for damages for conversion even on the hypothesis that such creditor was a trespasser in taking the property by attachment.

3. ————: ————: Legal Holiday. One should not be deprived of his legal defense to an action for damages for conversion

(113)

where he brought an attachment suit on a legal holiday when such action was merely a subterfuge to hold the property until it could be delivered to a receiver in bankruptcy.

4. ——————: Bankruptcy. Where a debtor pays and a creditor receives, the amount of a just debt, the natural presumptions are in favor of the good faith of the transaction.

5. BANKRUPTCY: Elements of a Preference. There are two kinds of preference in bankruptcy, first, those which a creditor in good faith may accept and retain, and, secondly, those which are forbidden and therefore, are avoidable. In the latter class the constitutive elements of a preference are, first, the insolvency of the debtor at the time of the preference; second, the giving of the preference within four months of the petition in bankruptcy; third, the effect of securing to the favored creditor a greater percentage of his debt than other creditors of the same class may obtain from the estate of the debtor, and, fourth, that the preferred creditor, when he received the preference knew, or had reasonable cause to believe, that it was the purpose of his debtor to give him a preference over other creditors of the same class.

Appeal from Jackson Circuit Court.—*Hon. James H. Slover,* Judge.

AFFIRMED.

*George W. Groves, New, Miller, Camack & Winger, Krauthoff, McClintock & Quant* for respondents.

*Ringolsky & Friedman, Eugene Batavia* and *H. L. Jacobs* for appellant.

JOHNSON, J.—This is an action to recover damages for the alleged wrongful conversion of certain merchandise taken from the possession of plaintiff under levy of a writ of attachment issued in aid of an action brought by defendant Battreal Shoe Company against George L. Keller. The petition alleges that on the date of the levy, January 1, 1912, plaintiff "was the owner of and in possession of the goods (describing them) of the value of $1100," and that as such owner "it shipped same from Orrick, Missouri, to it-

self in Kansas City, Missouri, in care of the Wells-Fargo Express Company on January 1, 1912, and that on the arrival of the aforesaid merchandise the said defendants wrongfully and unlawfully took the aforesaid merchandise from this plaintiff and converted the same to their own use.'' The defendants were the Battreal Shoe Company, the attachment creditor of Keller and J. F. Meade, the surety on the attachment bond. The answer of Meade was a general denial, that of the Shoe Company, in addition to a general denial, pleaded defenses, the nature of which will be disclosed in our statement and discussion of the case. At the conclusion of the evidence plaintiff took an involuntary nonsuit as to Meade and the action proceeded against the remaining defendant and resulted in a verdict and judgment in its favor. Plaintiff appealed.

Keller, who lived in Richmond, Ray county, embarked in the business of retail merchant in Missouri City, in that county, in October, 1911, and in the following December, removed the business to the nearby town of Orrick. He bought the major part of his opening stock from plaintiff, a wholesale dealer in Kansas City in clothing and men's furnishing goods, and made smaller purchases of boots and shoes and other goods from other jobbers. His business career was shortlived and most disastrous, due largely to serious illness in his family which kept him from attending to business and exhausted his resources. His initial purchases from plaintiff amounted to more than $900. He paid $200 when he ordered the goods and agreed to send weekly remittances on account of the remainder. Subsequent purchases increased the debt to $993 and he owed this sum to plaintiff at the time of his failure, which may be said to have occurred on Sunday, December 31, 1911. He also owed about $500 to the defendant Battreal Shoe Company for boots and shoes and a smaller amount to another jobber, the Webb Freyschlag Company. His assets had been reduced to the

stock of goods in his store which the evidence shows was worth not less than $750, nor more than $1100, or $1200, and consisted in part of goods purchased from plaintiff and in part of goods, fixtures, etc., purchased from other wholesale merchants, including defendant. Plaintiff became uneasy over the unsatisfactory condition of its account and a day or two before Christmas, 1911, its president, Ernest Wolff went to Orrick and finding Keller was at his home in Richmond, proceeded there, but was unable to obtain an interview with Keller who was at the bedside of his dying child. Wolff testified, ''I came back home and made up my mind that I would get my money from Mr. Keller or else I would replevin my merchandise, because I wanted to get through with the account, I had no time to fool with it.''

Following this unsuccessful trip, Mr. Black, a lawyer of Richmond, who had been retained by Keller, visited plaintiff's office in Kansas City on personal business with its bookkeeper, Mr. Taylor, who had been his warm personal friend for many years, and during the conversation with Mr. Taylor was informed of plaintiff's anxiety over the state of Keller's account and of its purpose to place it in Black's hands for collection. Wolff, who was drawn into the conversation, testified: ''The sum and substance of the conversation we had was that he thought that he could help us to get the money from Mr. Keller, or else the goods and in the conversation he let it appear that he was Mr. Keller's attorney.'' Several days afterwards, Taylor telephoned Black who had returned to Richmond and after a short conversation was succeeded at the telephone by Wolff who, according to his testimony, inquired if Black had spoken to Keller about the subject of his former conversation. Black answered that he had, that Keller was then in the room with him, and had authorized him to tell Wolff to go to Orrick and take all the goods in the store if he would accept them

in full discharge of the account. "There are just about enough goods left there to cover your claim," Black is quoted as saying, "maybe not quite enough, and if you are willing to give Mr. Keller a receipt in full for the account, you go over and take those goods, provided if they are short you will receipt just the same in full." The testimony of Taylor who was introduced as a witness by plaintiff differs materially from that of Wolff. He states that at an interview between Black and Wolff and Taylor, Black asked Wolff, "If I will get your goods back will you be satisfied?" and Wolff answered, "Yes, I would like to have the money or the goods back—either one will be satisfactory." Taylor, a day or two later telephoned Black at Richmond and was told that "Keller was willing for Mr. Wolff to go there and get the amount of his goods." Taylor then called Wolff to the telephone and he continued the conversation. Black testified: "My first conversation was with Mr. Taylor with reference to his affairs, and then I talked to Mr. Wolff. And I told him Keller's family was sick, three of his children were sick, and his wife was sick, and I thought it was very doubtful if she or the children lived. One of them afterwards died. And that he couldn't attend to his business there like it should be attended to. And that Keller represented to me that he had a sufficient amount of goods to pay his creditors, and that his idea was to give back to these creditors whatever goods he had on hand which he had purchased from each particular creditor, and at his request I had come to Kansas City to see Mr. Wolff about making him a proposition to take back whatever goods Keller had purchased from him, in payment of Wolff's bill. . . . I think I told Mr. Wolff that Mr. Keller owed the Battreal Shoe Company five or six hundred dollars, something over $300, and other bills. I don't know that I gave him a list of each creditor and the amount due each one. I don't think I had the list with me. . . . He

(Wolff) said he was willing to take them back. I told him I would go home that night, and I would have Mr. Keller 'phone to his clerk at Orrick to give Mr. Wolff permission to come in the store and take out of the store whatever goods Mr. Wolff found there which he had sold to Mr. Keller.''

Keller states, in substance, that it was his idea to allow each of his mercantile creditors to take the goods belonging to him in satisfaction of his claim, that he so instructed his attorney Black, and being informed by the latter that he had made that kind of arrangement with plaintiff, telephoned his clerk in charge of the store to allow Wolff to take only such goods as he had bought of plaintiff. Of the instructions he received, Moore, the clerk, testified: ''Mr. Keller told me that Mr. Wolff would be there either that day or the following day to get some goods that belonged to him or that Mr. Wolff had sold to Mr. Keller. And he says, give him what goods he sold me and none other and be sure he don't get anything else.''

Wolff and an assistant went to Orrick the next day, which was Sunday, December 31, 1911, arriving there early in the afternoon. Moore met them at the station, accompanied them to the store and after they entered, informed Wolff: ''Mr. Keller advised me you have some stuff in here that you have sold him.'' Wolff replied: ''All right, we will go and get it.'' He had brought a number of trunks and cases with him and had them hauled to the store and he and his assistant began removing all the goods in the store and packing them in the trunks. Moore protested but Wolff declared his purpose to ''take everything in sight,'' observing ''possession is nine points in the law.'' Moore then went out and telephoned Black at Richmond for instructions, after which he returned to the store with the town marshal who concluded he had no authority to stop Wolff ''unless I had papers or something of that kind.'' Wolff admits that Moore protested

against the removal of any goods but those Wolff had sold to Keller, but states he thought Moore was joking. He took everything from the store except the stove, which was hot, packed the merchandise in the trunks and expressed them to Kansas City on the first passenger train.

Attorneys at Kansas City for the Battreal Shoe Company, learning of what was occurring at Orrick, brought suit on January 1, 1912 (a legal holiday) in the circuit court of Jackson county, against Keller and procured the issuance of a writ of attachment in aid of the suit. The grounds of attachment stated in the affidavit were that Keller had fraudulently conveyed, concealed and removed his property or was about fraudulently to convey, conceal or remove it, so as to hinder and delay his creditors. The writ was levied on the goods as soon as the trunks arrived in Kansas City. The next day the Battreal Shoe Company, as sole petitioning creditor, filed a petition in bankruptcy against Keller, had a receiver appointed and the sheriff turned the attached goods over to the receiver. An adjudication was entered, a trustee was appointed and qualified, the goods were sold pursuant to an order of the bankruptcy court for $750 and after the payment of the costs and expenses and the exemptions set off to Keller, enough of the proceeds remained to pay a dividend of five per cent to the creditors.

We think the evidence indisputably shows that when the goods were seized by the sheriff under the writ of attachment plaintiff had bare possession of them without title or any substantial claim of ownership. It is idle for Wolff, who acted as the executive officer of plaintiff, to claim he understood that he was to be allowed to take all of the property in the store and was not to be restricted to goods Keller had received from plaintiff. The only reasonable inference the evidence will support is that with full knowledge of the insolvency of Keller he agreed to take back the

goods plaintiff had sold which still remained in the store and to release plaintiff's claim in preference to having the assets of its debtor administered in the bankruptcy court, and in carrying out that agreement, found and employed an opportunity to take, not only the property Keller had agreed he should have, but also to take by force all of the remaining property which he knew Keller intended to reserve and to turn over to other creditors. Certainly plaintiff, by such high-handed conduct, acquired no title to the property Keller intended to reserve, and though it should be conceded for argument that but for the bankruptcy laws plaintiff would have acquired the title to the goods Keller had authorized it to take by reducing them to its possession, still the conclusion would be irresistible that the transfer of those goods to plaintiff constituted a voidable preference as that term is understood and applied in the bankruptcy courts and that as against the trustee in bankruptcy, plaintiff had title neither to the goods it wrongfully took by force, nor to those it took in virtue of the preferential agreement.

We concede that plaintiff had a valid demand against Keller for $993 and that subject to the bankruptcy rule against voidable preferences, it had the right to receive payment of its just claim, either in money or in goods, and we have in mind the rule that "where a debtor pays and a creditor receives, the amount of a just debt, the natural presumptions are in favor of the good faith of the transaction." [Tumlin v. Bryan, 165 Fed. Rep. 166; Newman v. D. G. Co., 174 Mo. App. 528.]

In the case last cited we noted the recognition in the bankruptcy laws of two kinds of preferences—those which a creditor in good faith may accept, and retain, and those which are forbidden and therefore are voidable. The constitutive elements of a preference of the latter class are, first, the insolvency of the debtor at the time of the preference; second, the giv-

ing of the preference within four months of the petition in bankruptcy; third, the effect of securing to the favored creditor a greater percentage of his debt than other creditors of the same class may obtain from the estate of the debtor and, fourth, that the preferred creditor, when he received the preference knew, or had reasonable cause to believe, that it was the purpose of his debtor to give him a preference over other creditors of the same class. [Gill v. Safe Co., 170 Mo. App. l. c. 485.]

Where these four essential elements are found in combination, as in the present case, the beneficiary of the preferential conveyance can have no title or right to possession as against the trustee in bankruptcy. Proof that the preference was voidable destroyed the initial presumption of plaintiff's good faith in accepting payment of its just claim and placed it in the position of attempting to evade and defeat the application of the bankruptcy laws to the estate of its insolvent debtor. The position defendant assumed in causing the property to be seized under a writ of attachment sued out against Keller was no more tenable than that of plaintiff in obtaining the voidable preference. The fact that such a preference had been attempted gave it no ground of attachment, since to say otherwise would be to hold that one voidable preference could be made to serve as a basis in law for the creation of another.

The bankruptcy laws provide that all attachments obtained through legal proceedings against a person who is insolvent, at any time within four months prior to the filing of a petition in bankruptcy against him, shall be deemed null and void, in case he is adjudged a bankrupt, and the property affected by such attachments shall be deemed wholly discharged and released from the same, and shall pass to the trustee as a part of the estate of the bankrupt. [Loveland on Bankruptcy (4 Ed.), XCII, XCIV; Black on Bankruptcy (10 Ed.), p. 297.]

The attachment suit can be regarded in no other light than as a wrongful attempt by defendant to secure an unlawful preference from its insolvent debtor and the subsequent filing of a petition in bankruptcy and delivery of the attached goods by the sheriff at the request of defendant to the receiver appointed by the bankruptcy court, followed by the adjudication of bankruptcy, had the effect of discharging the attachment and passing the title of the goods to the receiver.

From the facts that the levy of the attachment was wrongful, preceded the filing of the petition in bankruptcy, and was made while the property was in the possession of plaintiff, it is argued that regardless of whether or not plaintiff had title to the property, the fact that it was in possession alone will sustain its right to maintain an action for conversion against defendant, a stranger to the title, and, therefore, a mere trespasser when it caused the property to be seized and taken from the possession of plaintiff.

It is said in Rosencranz v. Dry Goods Co., 175 Mo. l. c. 531: "The mere fact that a naked trespasser is the creditor of the owner of the goods, or that the plaintiff's title may be founded in fraud will not justify the trespass."

The general rule is that where the plaintiff was in actual possession of the property at the time of the taking he is entitled to maintain an action for conversion against a stranger to the title who takes the property from him since his possession is presumed to be rightful and it is no defense to show that he had no title.

But if not the true owner of the property, the defendant still may defeat the action of a mere naked possessor if he "can in some way connect himself with the owner's title." As is said in Marcy v. Parker, 78 Vt. 73: "Actual possession of personal property is enough, prima facie, to sustain an action in trover for its conversion against anyone except the true owner,

or one connecting himself in some way with the true owner. In such circumstances, in order to defeat a recovery, the burden is on the defendant, not only to show a better title in some other person, but also his connection with such other person." [See, also, 38 Cyc. 2062; Adelberg v. Horowitz, 32 N. Y. App. Div. 408; Lord v. Woolley, 144 N. Y. Supp. 385; Wheeler v. Lawson, 103 N. Y. 40; Brown v. Shaw, 51 Minn. 266; Stevens v. Gordon, 87 Me. 564; Skinner v. Pinney, 19 Fla. 42; Harker v. Dement, 9 Gill (Md.) 7; Mitchell v. Thomas, 114 Ala. 459; Omaha Co. v. Tabor, 13 Colo. 41; Terry v. Allis, 20 Wis. 32; Watson v. Coburn, 35 Neb. 492.]

Since Keller was insolvent and was in condition to be proceeded against as a bankrupt, defendant, as a creditor, entitled to share in the distribution of the estate, fell within the class of third persons "in some way connected with the title" which, despite the attempted preference to plaintiff, subsequently passed unimpaired and unaffected by that preference, directly from Keller to the receiver and then to the trustee. In other words the title acquired by the trustee related back to Keller, and defendant, as a beneficiary, should be allowed to interpose the defense of the superior and, indeed, exclusive title, of his trustee against the action of a mere naked possessor.

But aside from the defense of being connected with the title another rule which precludes a recovery by plaintiff is that where the plaintiff's possession was not rightful as against the owner (in this case the receiver and trustee in bankruptcy) a surrender of possession to the owner before the action was brought by the plaintiff is a complete defense. [2 Cooley on Torts (3 Ed.), sec. 522; Clark v. Haylord, 24 Conn. 484; McKinnon v. Western Development Co., 196 Fed. 487; Fisher v. Bartlett, 8 Me. 122; Ogle v. Atkinson, 5 Taunt. 759; King v. Richards, 6 Whart. 418.] The delivery of the goods by the sheriff at defendant's re-

quest to the receiver in bankruptcy who, as we have shown, took the title from the bankrupt free from the attempted preference, is a complete defense, even on the hypothesis that defendant was a trespasser in taking the property by attachment.

We do not think defendant should be deprived of these defenses on the ground urged by plaintiff that the attachment suit which was brought on a legal holiday was a prostitution of legal process because "it was wholly without legal merit and was merely a subterfuge to hold the property until it could be delivered to a receiver in bankruptcy."

The rule against the willful perversion of legal process to secure some ulterior advantage is recognized in this State. [Rosencranz v. Swofford, 175 Mo. 1. c. 531; Matthews v. Eby, 168 Mo. App. 1. c. 145.]   But we find no ground upon which it may be held that defendant violated that rule. Keller, the bankrupt, lived in the territorial jurisdiction of the district court of the United States for the Western District of Missouri which had jurisdiction over bankruptcy cases, and its jurisdiction to impound this property as the property of Keller did not depend upon and was not aided by defendant's suit in attachment.

Plaintiff could not have escaped surrendering possession of the property to the custody of the officers of the bankruptcy court or in lieu thereof accounting for its value and we will not entertain the thought that plaintiff contemplated secreting the property during the legal holiday in the hope that the trustee in bankruptcy, owing to the fact that Keller had kept no books or records of his business, would be unable to show what property had been taken in the descent upon the store, or its value. We must assume that neither the receiver, the trustee, nor defendants as creditor beneficiaries, secured any advantage or benefit from the attachment suit and, therefore, the motive in bringing that suit is immaterial.

On the indisputable facts of the case the learned trial court should have given the peremptory instruction requested by defendants, and this being so, the judgment for defendants rendered on the verdict of the jury will not be disturbed.   Affirmed.

All concur.