In re Albert J. WEGNER, Margie A. Wegner, Debtors.

Gregory G. MURPHY, Trustee, Plaintiff,

v.

William C. GRIFFEL, Defendant.

Bankruptcy No. 485–00002. Adv. No. 485/0026.

United States Bankruptcy Court, D. Montana.

May 12, 1986.

Doug James, Billings, Mont., for trustee.

Stephen C. Mackey, Billings, Mont., for debtors.

W. Corbin Howard, Billings, Mont., for Griffel.

Doug Howard, Heard Law Firm, Columbus, Mont., for Yellowstone Bank of Columbus.

Mark Lodine, U.S. Dept. of Agriculture, Missoula, Mont., for Farmers Home Admin.

## OPINION AND ORDER

JOHN L. PETERSON, Bankruptcy Judge.

The Trustee filed an adversary complaint to void two preferences. The Defendant Griffel (Griffel) denied the allegations of the complaint. Trial of the cause was held on October 17, 1985, and concluded, after continuance, on January 30, 1986. All parties have submitted memorandums in support of their respective positions.

The Debtor, Albert Wegner, (Debtor) and Griffel have been long time friends. From 1956 to 1980, Griffel owned and operated a ranch in Stillwater County, Montana, consisting of 8,000 acres of dry farm land, irrigated land and pasture. The farm was broken into two operating units called the upper and lower ranch. In March of 1980, Griffel entered into a ranch management agreement with his stepsons, who ran the ranch with the exception of the dry farm land until May, 1981. The Debtor farmed the dry land in 1981, and at Griffel's request, put up his hay and helped with Griffel's cattle. Griffel had begun a trucking business in 1976, and by 1981, he wanted to shed himself of the ranch operation to devote full time to the trucking business. After negotiations between the parties, the Debtor and Griffel, in December, 1981, entered into an oral lease agreement whereby the Debtor leased all of Griffel's land for five years on terms which called for cash payments for the pasture land and a share of the crop produced on the cropland. Next, on February 1, 1982, the parties entered into a written sales and purchase agreement whereby the Debtor bought on terms all of Griffel's cattle, consisting of 178 cows and 90 yearlings and the machinery for a total purchase price of $169,-188.00. The purchase price was to be paid in annual installments as follows:

July 1, 1983–$ 4,000.00 principal plus interest at 14% on the unpaid balance.

July 1, 1984–$40,000.00 principal plus interest

July 1, 1985–$40,000.00 principal plus interest

July 1, 1986–$40,000.00 principal plus interest

July 1, 1987–$45,180.00 principal plus interest.

The agreement further specified that title to the cattle and machinery would remain in Griffel "until the balance of the purchase price for all of the personal property is paid in full or until the buyer and seller make other arrangements which may be mutually agreeable". Moreover, during the term of the contract, Griffel's livestock would be branded with Griffel's brand, but the Debtor in his sole discretion would be able to sell the calves and cull cows, and upon notice to Griffel of such election, Griffel was obligated to provide a bill of sale to such livestock to facilitate the sale. The contract contained a default provision requiring 90 days notice in writing, and if the default was not cured in said period of time, the contract was at an end, allowing Griffel "to retake possession of the personal property" and keep any payments "as a reasonable rental for the use of such personal property, and as liquidated damages".

In separate oral agreements in 1981, 1982, 1983 and 1984, Griffel sold his share of the hay and crops to the Debtor, taking promissory notes for the payment. The 1981 and 1984 notes were paid, but the notes for 1982 and 1983 have never been paid.

At the time the contract for sale was executed, the cattle and machinery were located on Griffel's property leased to the Debtor, and that situation remained the same during the term of the agreement. The Debtor also ran his cattle with those of Griffel.

The Debtor made two payments on the contract. In June, 1983, he paid $40,-261.47, which was credited to $4,000.00 principal and the balance to interest. On March 19, 1984, the Debtor paid Griffel $61,218.12, with about $39,000.00 credited to the January 1, 1984, note for hay and silage, and the balance credited to interest due on the sale and purchase agreement. Further, within 25 days of bankruptcy, on December 10, 1984, the Debtor paid Griffel $17,839.01, for cattle sold by the Debtor for which Griffel had given a bill of sale in accordance with the Buy-Sell Agreement.

On December 12, 1984, the Debtor called Griffel on the telephone, advised him he was broke and could not continue the lease or pay the contract, and that he was contemplating filing bankruptcy. The Debtor told Griffel to take over the feeding of Griffel's cattle. Griffel advised the Debtor that he was leaving on a truck trip to Spokane, was not in a position to physically care for and feed the cattle, and asked the Debtor to do so for him. The Debtor agreed. Griffel further asked and was advised by the Debtor that all machinery was on the place, i.e., the Griffel farm. Griffel, in early January, took over the care of the cattle. On December 10, 1984, before the phone call, the Debtor sent Griffel an unsigned letter which enclosed three checks totaling $17,839.01, endorsed payable to Griffel and stated, "Please be informed that we are in the process of filing for bankruptcy, will be unable to meet any other purchase obligations or our lease agreement." On January 11, 1985, Griffel's attorney wrote the Debtor stating, in substance, that the Debtor's December 10, 1984, letter acknowledged default, that notice of default was waived or unnecessary, and that the Debtor consents to repossession of the cattle and machinery by Griffel, "which Mr. Griffel intends to effectuate on Monday, January 14, 1985". The Debtor had filed bankruptcy on January 3, 1985. With regard to the attorney letter of January 11, 1985, Griffel testified he did not suggest the repossession language contained in that letter but told his attorney he would be able to start feeding the calves January 14, that he was unaware of the contents of the letter until his deposition was taken on August 23, 1985, and that he already had possession of the cattle and machinery since the phone call of December 12, 1984, when the Debtor told him he was through with the agreement. As evidence of the Debtor's abandonment of the contract and lease, Griffel presented in evi-

dence a memorandum dated 10–16–85 from the Montana Power Co. which stated that on December 12, 1984, Al Wegner asked to have the above electric meters read out and these accounts put in the name of William Griffel.

From the above facts, the parties agree there are three principal issues presented:

1. Whether the February 1, 1982, Contract For Sale and Purchase of Personal Property, was an executory contract, and if so, was it terminated before January 3, 1985, the date of order of relief.

2. Whether the transfer of the Debtor's interest in the cattle and machinery to Griffel on December 12, 1984, created a security interest which was a preferential transfer under Section 547 of the Code.

3. Whether the transfer and payment of $17,839.01 to Griffel on December 10, 1984, was a preferential transfer under Section 547 of the Code.

*Issue 1.* Was the February 1, 1982, contract an executory contract? If the contract is executory, the Trustee has the right to accept or reject the contract, thereby assuming the burden of payment or rejecting that burden. The Trustee argues the agreement is not an executory contract and the cattle and machinery are property of the bankruptcy estate. The Trustee contends the agreement was in essence a security agreement for the payment of money but was not perfected on the date of bankruptcy thus leaving Griffel as an unsecured creditor. It is admitted Griffel made no filing under the Uniform Commercial Code to perfect a security interest in the personal property. Rather, Griffel contends title never passed in the goods by reason of the express language of the contract. Of course, if the contract is executory as argued by Griffel, then the Trustee, to accept the contract, must cure any default, as provided under Section 365(b)(1) of the Code. I hold the contract is not an executory contract under the provisions of Section 365 of the Code.

The latest discussion on executory contracts is the Ninth Circuit Bankruptcy Appellate Panel case of *Horton v. Rehbein* (In Re Rehbein), 60 B.R. 436, (9th Cir.1986). Because the decision discusses the law on executory contracts. I extensively quote from the decision, which held a contract for deed for the sale of real property was not an executory contract:

"Whether a contract is executory is a question of federal law. *In Re Alexander,* 670 F.2d 885, 888 (9th Cir.1982); *In Re Chochise College Park, Inc.,* 703 F.2d 1339, 1348 fn. 4 (9th Cir., 1983).

In drafting the Code, Congress did not define the term 'executory contract'. The Supreme Court, citing the legislative history, has characterized an executory contract as one 'on which performance is due to some extent on both sides'. *NLRB v. Bildisco & Bildisco.* 465 U.S. 513, 522 n. 6, 104 S.Ct. 1188, 1194 n. 6, 79 L.Ed.2d 482 (1984). The legislative history reflects that:

A note is not usually an executory contract if the only performance that remains is repayment. Performance on one side of the contract would have been completed and the contract is no longer executory.

H.R. Rep. No. 95–595, p. 347 (1977); S. Rep. No. 95–989, p. 58 (1978); U.S.Code Cong. & Admin.News 1978, p. 5844. This definition is substantially the same as that of Professor Countryman which has been adopted by the Ninth Circuit. See *In Re Alexander,* supra, 670 F.2d at 887. Under this definition executory contracts are those in which the obligations of both parties are so far unperformed that the failure of either to complete performance would constitute a material breach excusing the performance of the other. Countryman, *Executory Contracts in Bankruptcy:* Part 1, 57 Minn.L.Rev. 439, 460 (1973); *In Re Pacific Exp. Inc.,* 780 F.2d 1482, 1487 (9th Cir., 1986).

Several courts have held that a Contract for Deed is not an executory contract. *In Re Adolphsen,* 38 B.R. 776, 778 (Minn.1983); *Matter of Cox,* 28 B.R. 588,

591 (Idaho 1983); *In Re Booth,* 19 B.R. 53, 58 (Utah 1982); and *In Re Britton,* 43 B.R. 605, 607 (E.Mich 1984). *Contra: Shaw v. Dawson,* 48 B.R. 857, 862 (D.N. M.1985); *In Re Roman Crest Fruit, Inc.,* 35 B.R. 939, 948 (S.N.Y.1983). Although this question is one of first impression before the Panel, we decided a similar question in *Matter of Rojas,* 10 B.R. 353, 355 (9th Cir. BAP 1981). There, we found that a secured installment purchase contract for a truck was not an executory contract. See also *In Re Pacific Exp., Inc.,* supra, 780 F.2d at 1487–88. The same rationale applies in this case.

Contracts For Deeds are merely a financing arrangement for a sale which has already occurred. The vendor retains legal title only as security for the price. Since the deed was placed in escrow prior to the commencement of bankruptcy proceedings, the Debtor has fully performed. As a practical matter, the vendor performs no duties after the execution and deposit of title documents with the escrow agent. The vendor cannot terminate the agreement and recover possession of the property unless there is a material breach by the buyer. *Matter of Newcomb,* supra, 744 F.2d at 624. Unless a contract is executory on both sides, it cannot be an executory contract. The court in *In Re Adolphsen,* supra, 38 B.R. 776, found that a Contract for Deed was not an executory contract even where the deed was not placed in escrow but was retained by the vendor as security until the purchase price was paid. The court reasoned that a Contract for Deed paralleled a note. The vendor, like a lendor, merely awaits repayment. The fact that a vendor retains legal title and must in the future 'convey it to the debtors does not render the contract executory any more than the duty of the holder of a promissory note to return the note when the debt is satisfied makes it executory'. 38 B.R. at 778.

This Court does not hold that Contracts for Deed can never be executory. We hold only that where the debtor has already placed the deed in escrow and has no other material obligations to perform, a Contract for Deed is not executory. Since this contract was not executory, the Appellants were not entitled to notice of its sale under 11 U.S.C. Sec. 365(i) or (j) or under Rule 6006."

The court notes in footnote 5:

"An example of an executory Contract for Deed existed in *In Re Cochise College Park, Inc.,* supra, 703 F.2d at 1345. Therein, the trustee had to construct various improvements on the land as well as to convey title. *In Re Alexander,* supra, 670 F.2d at 886, the seller had yet to give up possession or to convey title."

The case of *In Re Rojas,* supra, cited in *Rehbein,* involved the sale of a truck under an installment purchase contract, which went into default. The creditor asserted that because it still had to tender a certificate of title, it had a material obligation to perform, and thus the contract was executory. The court held the contract was in substance, not executory, but gave the creditor a secured interest in the vehicle.

The fact that title was reserved in the seller in the contract for the sale of cattle and machinery is immaterial under Montana law. Under Section 30–2–401(1), MCA, title passed to the Debtor when he took possession of the goods. This section of the Uniform Commercial Code is discussed in *Anderson, Uniform Commercial Code,* 2–401:54:

"The Code provides, in effect, that one who delivers goods cannot retain title. At most, he may retain a security interest or obtain a lien.

Although the intent of the parties ordinarily prevails, the Code flatly declares that even when the parties intend that the seller retain the title to the goods, such reservation only has the effect of a security interest. The fact that the parties intended that title be reserved has no effect."

Section 30–9–202, MCA, provides:

"Title to collateral immaterial. Each provision with regard to right, obligations

and remedies applies whether title to the collateral is in the secured party or in the debtor."

The UCC thus makes the location of title and formal transfer of title immaterial. "Since the Uniform Commercial Code has abolished the technical distinction between various security devices, the federal Bankruptcy Court should no longer feel compelled to engage in a purely theoretical exercise of locating 'title' nor should consideration of where 'title lies' influence the courts in the exercise of their equitable discretion." *In Re Yale Express System*, 370 F.2d 433, 437 (2nd Cir., 1966).

The further fact that the cattle were to retain the brand of Griffel is not persuasive that the contract was executory. The Debtor could sell the calves and cull cows at any time, and Griffel had to provide a bill of sale for such sale. A brand creates a presumption of title under Section 81-3-105, MCA, but is not conclusive, and the ownership can be overcome by competent evidence. *Costello v. Shields*, 99 Mont. 335, 346, 43 P.2d 879, 883 (1935). That presumption was overcome in this case by the surrender of possession of the cattle to the Debtor, his caring for such cattle and Griffel's total lack of attention to the cattle until December 12, 1984. The agreement of February 1, 1982, is not an executory contract, as the menial task of providing a bill of sale or reserving a brand does not make it executory.

As for the machinery, the contract is silent on transfer of title by bill of sale from Griffel, so there was nothing for him to do in that regard. Possession by the Debtor transferred title. As to the cattle, a bill of sale was required when the Debtor so elected to sell the calves or cull cows. Under the agreement, Griffel sold 178 cows and 90 heifers. We now have at issue in possession of Griffel 92 cows and 149 calves, being offspring of the cattle sold in 1982, thus born after the February 1, 1982, agreement. We must now determine whether these cattle are property of the estate in which Griffel had a security interest and whether the transfer of the cattle and machinery was a preference.

*Issue 2.* Whether the transfer of the Debtor' interest in the cattle and machinery to Griffel on December 12, 1984, created a security interest which was a preferential transfer under Section 547 of the Code.

 As noted under Issue 1, a valid security interest in the cattle and machinery can be created by reservation of title in the seller. Sec. 30-2-401, MCA. Moreover, perfection of that security interest can be accomplished by possession without the filing of a financing statement. Section 30-9-302, MCA, provides:

"(1) A financing statement must be filed to perfect all security interests except the following:

(a) a security interest in collateral in possession of the secured party under 30-9-305;

Section 30-9-305, MCA, states:

"WHEN POSSESSION BY SECURED PARTY PERFECTS SECURITY INTEREST WITHOUT FILING. A security interest in * * * goods * * * may be perfected by the secured party's taking possession of the collateral. * * * A security interest is perfected by possession from the time possession is taken without relation back and continues only so long as possession is retained, unless otherwise specified in this Chapter. The security interest may be otherwise perfected as provided in this Chapter before or after the period of possession by the secured party."

"Goods" as used in the above section, includes all things which are moveable, such as machinery or cattle, and the unborn young of animals. Section 30-9-105(h), MCA.

*Collier on Bankruptcy* (15th Ed.), Section 547.49 [4.1], pp. 547-157/158 states:

"Section 9-302(1)(a) restates a principle common to the law prior to the UCC (i.e. pledge), that where the collateral is in the possession of the secured party, filing is not required for perfection. Under 9-305, this exception will apply only to

tanglible personal property such as goods, instruments, negotiable documents, chattel paper and letters of credit, and it will not apply to intangibles such as accounts where the intangibles serve as collateral. The security interest is perfected at the time possession is obtained without relation back and continues only as long as possession is retained.

In the case of a security interest that would have taken the form of a pledge but falls within Article 9, the elements of a voidable preference in Section 547 will be tested as of the date possession of the collateral is obtained by the secured party, regardless of the existence of any earlier date of contracting."

The official comment to Section 9–305 of the UCC states:

"3. The third sentence of the section rejects the 'equitable pledge' theory of relation back, under which the taking possession was deemed to relate back to the date of the original security agreement. The relation back theory has had little vitality since the 1938 revision of the Federal bankruptcy Act, which introduced in Section 60(a) provisions designed to make such interests voidable as preferences in bankruptcy proceedings. This section now brings state law into conformity with overriding federal policy: where a pledge transaction is contemplated, perfection dates only from the time possession is taken, although a security interest may attach, unperfected, before that under the rules stated in Section 9–204 * * *"

In the present case, the Trustee argues that perfection of the security interest never occurred because Griffel took possession post-petition as stated in the attorney's letter of January 11, 1985. I disagree, for the facts show the Debtor in fact delivered possession of the collateral to Griffel on December 12, 1984. The mere fact that Griffel asked the Debtor to care for the cattle for a short period of time does not

change the fact the Griffel had possession by the Debtor's action on December 12, 1984. Nor do I accept the argument of Griffel, that since the cattle and machinery never left the Griffel place, possession was in fact taken by Griffel when the agreement was signed February 1, 1982. At that date, the place was under lease to the Debtor, who, by law and terms of the lease, had control of the premises. Thus, I hold the agreement of February 1, 1982, covering sale of the cattle and machinery and reserving title in Griffel was a security instrument. Griffel perfected that security interest by taking possession of the cattle and machinery on December 12, 1984. Is the perfection a voidable preference to the Trustee?

Under the so-called strong arm provisions of the Code, a Trustee "shall have, as of the commencement of the case, and without regard to any knowledge of the Trustee or of any creditor, the rights and powers of, or may avoid any transfer of property of the debtor" that is voidable by the perfect judgment lien creditor. 544(a). Moreover, the definition of "transfer" under the Code is very broad and means "every mode, direct or indirect, voluntary or involuntary, of disposing of or parting with property or with an interest in property * * *". 101(48). Perfection of a security interest in the Debtor's property is a transfer at the time of perfection of that interest. *McWilliams v. Gordon*, 12 B.R. 829, 832 (Bankr.E.D.Pa.1981); 4 *Collier on Bankruptcy* (15th Ed.), 547.14, pp. 547–53/54.

Section 547 of the Code outlines some of the Trustee's avoiding powers. The preference statute [547(b)] allows a Trustee to avoid any transfer of an interest in property—

"(1) to or for the benefit of a creditor;

(2) for or an account of an antecedent debt owed by the debtor before such transfer was made;

(3) made while the debtor was insolvent;

(4) made—

(a) on or within 90 days before the date or the filing of the petition;

\* \* \* \* \* \*

(5) that enables such creditor to receive more than such creditor would receive if—

(a) the case were a case under Chapter 7 of this title;

(b) the transfer had not been made; and

(c) such creditor received payment of such debt to the extent provided by the provisions of this title."

Transfer can be avoided under 547 if six elements are established by the Trustee, who has the burden of proof. See 4 *Collier on Bankruptcy* (15th Ed.) 547.35 at 547–119. A preference is (1) a transfer of property of the Debtor (2) to or for the benefit of a creditor (3) for or on account of an antecedent debt (4) made while the Debtor was insolvent (5) within 90 days before the filing of the petition (6) that allows the creditor to realize more than he would under a Chapter 7 liquidation than he would had the transfer not been made.

█ It is undisputed the Debtor owed Griffel over $165,000.00 on the contract plus two promissory notes. Griffel filed a Proof of Claim in this cause showing $272,-262.11 as due Griffel, and admitted at trial that he was owed about $100,000.00. As stated above, the Debtor took title to the cattle and machinery in February, 1982, under Section 30-2-401 when he took possession. Thus, Debtor clearly had an interest in the property. The proof shows that on December 12, 1984, the Debtor was insolvent and his letter to Griffel of December 10, 1984, stating his financial dilemma has never been disputed by Griffel. The only issue is whether Griffel by perfecting his security interest on December 12, 1984, received more than he would under liquidation of the Debtor's assets if the transfer had not been made. In this regard, the Trustee argues Griffel was an unsecured creditor before perfection on December 12, 1984. This is true. By reason of the perfection, Griffel changed his status, took possession of the property, sold 78 calves

for $31,060.00 in April, 1985, and thus improved his position substantially.

In the case of *In Re Orth-O-Vision, Inc.*, 49 B.R. 943 (Bankr.E.D.N.Y., 1985) the court held that as a matter of law, whenever a general unsecured creditor receives a transfer within the preference period, the 547(b)(5) element of a preference is automatically satisfied unless all unsecured creditors will be fully paid in a Chapter 7 liquidation. The evidence in this case shows that the value of property received by Griffel was at least $131,200.00 against his claim of $272,000.00. There are presently pending disputed security claims against the property by Yellowstone Bank and Farmers Home Administration. The Trustee has shown that if the transfer is voided, Griffel will receive considerably less than what he has already received, for the bulk, if not the entire amount, of the Debtor's estate consists of the cattle and machinery. Thus, all elements of the preference have been satisfied by the Trustee.

█ *Issue 3.* Whether the transfer and payment of $17,839.01 to Griffel on December 10, 1984, was a preferential transfer under Section 547 of the Code.

This issue is not even a close call. Applying the above six elements to the payment, all elements have been satisfied. The Debtor was insolvent, the transfer was from funds of the Debtor, the funds were clearly property of the Debtor, the transfer of funds was within 90 days of bankruptcy, Griffel was a creditor for over $100,000.00 and Griffel received $17,839.01 more than he would under a liquidation of the Debtor's assets. When Griffel delivered the bill of sale for the cattle on November, 1984, Griffel was an unsecured creditor. At that date he never did have any perfected security interest as against the Trustee in such funds. A transfer under Section 547 can be effected by payment of money, *Pirie v. Chicago Title & Trust Co.*, 182 U.S. 438, 21 S.Ct. 906, 45 L.Ed. 1171; *In Re Fixen*, 102 F. 295 (9th Cir., 1900); 4 *Collier on Bankruptcy* (15th Ed.), 547.08, pp. 547–35, or the retaking of goods previously sold and deliv-

ered. *Wolff Mfg. Co. v. Battreal Shoe Co.,* 180 S.W. 396 (1915).

The theory of bankruptcy administration is that equality between creditors of the same class is equity and that such equity can be achieved only by setting aside preferences in favor of a few, who but for the preference rule would by their diligence or luck obtain a greater and an unjust share of the Debtor's estate. In this regard, Griffel cannot successfully contend that his status after recovery of the property on December 12, 1984, was that of owner of the personalty in view of the avoidance by the Trustee. I will leave the issue as to possible equitable subordination or recovery of costs for caring for the property for another day.

The evidence shows Griffel sold some of the cattle for $31,050.00 and a piece of machinery for $7,500.00. These sums are assets of the estate since they flow from the cattle and machinery owned by the Debtor.

IT IS ORDERED judgement shall be entered for the Plaintiff Trustee and against the Defendant William C. Griffel directing that the Defendant turn over and surrender to the Trustee the following property:

1. Cash in the sum of $17,839.01.

2. Cash in the sum of $31,060.00 plus the balance of 102 head of cross bred cows, 78 steers and 71 heifers; one corn chopper; one corn planter (John Deere); one corn cultivator (Noble); one feed truck (Ostwald); one Bobcat loader or $7,500.00 cash in lieu thereof; forage wagon (Richardson); Oliver two way plow; 1046 New Holland Bale Wagon; 200 Freeman twine tie, self propelled baler; Morris grain drill, rod and weeder attachment; and two grain augers (Mayrath).