**In re Lance L. BROWER and Maurine Brower, Debtors.**

**Phillip D. ARMSTRONG, Trustee of the Estate of Lance L. Brower and Maurine Brower, Plaintiff,**

**v.**

**Curtis ROHWEDER and Security State Bank, Wishek, ND, Defendants.**

Bankruptcy No. 85–05426.
Adv. No. 87–7094.

United States Bankruptcy Court,
D. North Dakota.

Aug. 16, 1988.

Phillip D. Armstrong, Minot, N.D., for plaintiff.

John M. Olson, Bismarck, N.D., for defendant, Curtis Rohweder.

Charles E. Johnson, Bismarck, N.D., for defendant, Security State Bank.

## MEMORANDUM AND ORDER

WILLIAM A. HILL, Bankruptcy Judge.

By complaint filed August 13, 1987, as later amended on April 4, 1988, Phillip D.

Armstrong, trustee of the Brower estate, seeks to avoid a transfer of 54 head of cattle which were repossessed by the defendant, Curtis Rohweder, on the eve of the Debtors' bankruptcy filing. He further asserts a paramount interest in the cattle over that of the defendant Security State Bank (Bank) and, armed with the avoiding powers of section 544, seeks recovery of either the cattle or their value. The case came on for trial on June 29, 1988. The facts as material to the issues presented are as follows:

### Findings of Fact

The Debtor, Lance Brower (Brower), is a young person possessed of considerable knowledge and experience in dairy farming. For a number of years he had worked for others, but was looking for an opportunity to start his own operation. In December 1984 he located and leased a small dairy outside of Zeeland, North Dakota by taking over payments to Mid–America. Although having the dairy facility, he had difficulty finding financing for the cow herd itself.

Curtis Rohweder has been in the cattle business his whole life; the business including backgrounding, selling and leasing of cattle. In 1984 the dairy cattle market was poor and Rohweder decided to try his luck at leasing his dairy cattle. In evidence are two "Livestock Lease Purchase Agreements" which are typical of Rohweder's dairy cow leasing arrangement. In the agreement, Rohweder is denoted as "seller" with the other party being termed the "purchaser". The agreement specifies the quantity of animals involved, referring to them as "cattle purchased" and states that after paying a particular sum per month for a prescribed number of months, the cattle are "purchased by leaser [sic]" and that upon completion of all payments the seller will provide a bill of sale. Risk of loss and all expenses incidental to the care and maintenance of the cows passes to the purchaser/lessor. Any breach in any of the terms or conditions by the purchaser/lessor permits the seller to void the balance of the agreement and "immediately recover all sums of money due for the purchase of said cattle from the purchaser". The agreement contains no language providing for the return of the cattle themselves. Indeed, the agreement provides that prior to purchase of the cattle the purchaser has the right to examine the cattle in the seller's yard and reject any and all cattle at that time, but the failure to do so shall constitute "irrevocable acceptance of the cattle and bind him to pay the contract price for the cattle".

Rohweder did business with the Security State Bank and in 1980 and in 1983 had given the Bank a security interest in farm equipment and livestock, specifically cattle and horses. In 1980 the Bank filed U.C.C. 1 statements with the McIntosh County Recorder covering all livestock, proceeds and products. These financing statements were continued in May of 1985. Another U.C.C. 1 was recorded in August 1983 also covering all livestock, specifically cattle. On December 23, 1985, the Bank took a specific security interest in all of Rohweder's personal property which, according to its officer, meant the dairy cows involved in the leasing venture. The security agreement covers all personal property, documents of title, accounts and contract rights as well as any returned or repossessed goods and any proceeds. On December 24, 1985, the Bank filed a U.C.C. 1 with the North Dakota Secretary of State as well as the McIntosh County Recorder covering "all inventory ... involved in a dairy leasing operation." The Bank was familiar with the nature of Rohweder's leasing operation and consented to it so long as any cows involved bore his brand and the Bank received a milk assignment as well as a copy of the lease agreement. The Bank, comfortable with Rohweder's abilities, left the business of leasing up to him with no separate consent necessary for individual leasing deals.

Brower, as mentioned, was unable to finance the necessary dairy cows and one day noticed Rohweder's newspaper ad relative to cow leasing. He called Rohweder who, after looking over Brower's dairy facility, decided to lease him the necessary animals. Brower initially took possession

of forty head of Holstein springer heifers pursuant to a Livestock Lease Purchase Agreement dated January 4, 1985, and took possession of another twenty head pursuant to a February 25, 1985, agreement. All cows bore Rohweder's brand.

Both agreements are identical in printed content and are consistent with the lease language previously recounted above. Rohweder was the seller and Brower was the purchaser. The January lease provided that after paying $1,220.00 per month for forty-nine (49) months the cattle are purchased by the lessor for $1.00 per head. The February lease provided that after paying $610.00 per month for forty-nine months the cattle are purchased by lessor for $1.00.

All sixty cows except for three were first calf heifers whose milk production was 20% less than a mature cow. Brower began to chart the breeding and production history of the cows, a process it is acknowledged, would if maintained over several years result in a higher value for a mature herd. The three months these records were maintained by Brower was too short to be of any value.

In May of 1985 Brower sold five cows through the Wishek livestock market for an average price of $39.75 per cwt. or $0.40 per pound. The remaining 54 head plus three replacements stayed at his dairy and under his care until July 23, 1985. They were, by this time, all bred and the herd was showing production improvement.

An unfortunate partnership soured resulting in Brower's inability to continue with the dairy operation. Contemplating bankruptcy, he called Rohweder and advised him he would no longer be able to keep the herd and that Rohweder could have them back. On July 23, 1985, Rohweder picked up fifty-four head of dairy cows. Brower filed his Chapter 7 petition on July 26, 1985.

Brower opined that the cows, when returned, were in better condition than when he received them and in his bankruptcy schedules placed a value of $37,800.00 on them. Both Rohweder and his father testified that in July 1985, the market for dairy

cattle was poor regardless of quality. Rohweder senior believed the market price would have been $0.23 to $0.32 per pound. Their opinion was buttressed by the testimony of an independent cattle broker who viewed the herd at the time of their return. In his opinion there was no market for dairy cows and although the July 1985, slaughter price was $0.20 to $0.35 per pound, the cows, because they were dairy cows, were not fat enough for the slaughter market. In his opinion they weighed about 900 lbs. each on the average. He felt that Rohweder would have been better off fattening them up. Rohweder did sell off four to six of the animals for $0.25 to $0.35 per pound and the rest went to pasture. According to Rohweder the cows put to pasture weighed 900 lbs. on the average. Countering this, however, is a bill of lading pertaining to the shipment of 45 head of the repossessed cattle. The total load weight depicted is 52,000 pounds which suggests that as of July 23, 1985, the cows averaged not 900 lbs. but instead 1,155 lbs. apiece. The difference between the $0.40 per pound received by Brower for culls in May and the $0.23 to $0.32 per pound received by Rohweder for July culls suggests only that by July the market price had dropped. The court believes that the July market price actually received is the best evidence of what the cows were worth at market. The July market average based upon the amount actually received by Rohweder was $0.285 per pound and the average weight was not, 900 lbs. per animal but 1,155 lbs. This means that the 54 repossessed cows were worth $17,775.45.

### Conclusions of Law

#### 1.

The first claim raised by the trustee in this case is that Rohweder's repossession of the cattle from the Debtors was a preferential transfer under section 547 of the Bankruptcy Code. In order for the transfer to be a preference the trustee must prove the following elements:

1. A transfer of an interest of the debtor in property;

2. Made within ninety days before the date of petition filing;

3. Made to or for the benefit of the creditor;

4. On account of an antecedent debt;

5. While the debtor was insolvent;

6. Which enabled the creditor to receive more than it would have received in a Chapter 7 liquidation if the transfer had not been made.

11 U.S.C. § 547(b); *In re Hoggarth*, 78 B.R. 1000, 1001 (Bankr.D.N.D.1987). With respect to element number 1 the issue is whether the Debtors had an ownership interest in the cattle. This issue is resolved by analyzing the agreement between Rohweder and the Debtors to determine whether it is a true lease agreement or whether it is a sales agreement and disguised security interest. If the agreement was a lease then there was no preference because Rohweder was simply taking back his own property. If, however, it was a sales agreement then the Debtors had an ownership interest in the property and the first element of a preference, as set out above, is met.

■ The determination of whether an agreement is a lease or a sales contract is, as with all determinations regarding the nature of property interests, to be made under state law. *Butner v. United States*, 440 U.S. 48, 55, 99 S.Ct. 914, 918, 59 L.Ed.2d 136 (1979); *In re Cook*, 52 B.R. 558, 560 (Bankr.D.N.D.1985). Section 41–01–11(37) of the North Dakota Century Code, in part, provides:

> Whether a lease is intended as security is to be determined by the facts of each case; however, (a) the inclusion of an option to purchase does not of itself make the lease one intended for security, and (b) an agreement that upon compliance with the terms of the lease the lessee shall become or has the option to become the owner of the property for no additional consideration or for a nominal consideration does make the lease one intended for security.

This court has previously addressed the question of whether an agreement is a lease or a security interest. *See In re*

*Winckler*, 38 B.R. 103 (Bankr.D.N.D.1984); *In re Witkowski*, 37 B.R. 352 (Bankr.D.N.D.1984). The true character of an agreement is to be determined from the totality of its provisions. *Cook*, 52 B.R. at 561. Several factors indicate that an agreement is actually a secured transaction, including the following:

> Provisions requiring the lessee to keep comprehensive insurance in force on the property; to bear the loss of the property and to pay installments regardless of theft or destruction; to maintain the property in good repair at his expense; to pay taxes and assessments and license fees and registration fees in connection with the property.

> Additional indicia of a secured transaction (are) a disclaimer of warranty of fitness and suitability, a provision requiring, in the event of default, that all remaining unpaid installments of rent would become due and payable and lessee's possession terminated, and a provision authorizing the lessor to file a U.C.C. financing statement.

*Witkowski*, 37 B.R. at 353. Provisions similar to most of the above are included in the agreement between Rohweder and the Debtors. The most important factor is whether there is a purchase option at the end of the lease term and whether that option price reflects the fair market value of the property. *Wallwork Lease & Rental v. JNJ Investments, Inc.*, 303 N.W.2d 545, 547 (N.D.1981). *Carlson v. Tandy Computer Leasing*, 803 F.2d 391, 396 (8th Cir.1986). In the instant case the agreement indicates that the Debtors could purchase the cattle at the end of the term of the agreement for the nominal price of $1.00 per head. In *Carlson* the United States Court of Appeals for the Eighth Circuit reasoned that the consistent use of "lease language" was a significant indication that the parties intended the agreement to be a lease. By contrast in the agreement before this court the language is predominantly the language of a purchase agreement. *Carlson* 803 F.2d at 395.

As support for his contention that the agreement was a lease, Rohweder points out that the cattle were branded with his brand and that title to the cattle could not pass unless he executed a brand release or a bill of sale. He further asserts that even if the agreement is a sales agreement his brand creates in him a perfected security interest in the cattle in the same manner as holding the title to a car perfects a security interest. In North Dakota a brand creates a presumption that cattle are owned by the person whose brand they carry. *See* N.D.Cent. Code § 36–09–19 (1980). This presumption is, however, rebuttable. *In re Cook*, 63 B.R. 789, 795 (Bankr.D.N.D.1986). The presumption may be rebutted by other evidence of ownership. *See In re Wegner*, 61 B.R. 414, 420 (Bankr.D.Mont.1986) (discussing rebuttable presumption of ownership arising from brands under Montana law.) In *Wegner* the debtor purchased cattle from the defendant under an installment sales agreement. The agreement provided that the defendant would not execute a bill of sale on the cattle until all of the installments had been paid. A few weeks before the Debtors filed their bankruptcy petition, before they had made all of the installment payments, they tendered the cattle back to the defendant. The trustee sought to recover the value of the cattle from the defendant as a preferential transfer. The defendant resisted on the basis that the title to the cattle had not yet passed to the Debtor, in part, because of the cattle brand. In concluding that the transfer of the cattle had been a preference the court in *Wegner* reasoned as follows:

> [The] presumption [of ownership created by the brand] was overcome in this case by the surrender of possession of the cattle to the debtor, his caring for such cattle and [the defendant's] total lack of attention to the cattle until [they were repossessed]. The agreement ... is not an executory contract, as the menial task of providing a bill of sale or reserving a brand does not make it executory.

*Id.* All of these circumstances are also present in this case to overcome the presumption.

Even if the presumption is not rebutted its effect goes to the issue of who held the title to the cattle. This is not a dispositive issue in this case. Section 41–09–15 of the North Dakota Century Code (U.C.C. § 9–202) provides, "each provision of this chapter with regard to rights, obligations, and remedies applies whether title to collateral is in the secured party or the debtor." Section 41–02–46 of the North Dakota Century Code (U.C.C. § 2–401), in part, provides:

> Each provision of this chapter with regard to the rights, obligations, and remedies of the seller, the buyer, purchasers, or other third parties applies irrespective of title to the goods except where the provision refers to such title.... *Any retention or reservation by the seller of the title (property) in goods shipped or delivered to the buyer is limited in effect to a reservation of a security interest.* (emphasis added).

The court in *Wegner* interpreted these provisions as follows:

> The Code provides, in effect, that one who delivers goods cannot retain title. At most, he may retain a security interest or obtain a lien. Although the intent of the parties ordinarily prevails, the Code flatly declares that even when the parties intend that the seller retain the title to the goods, such reservation only has the effect of a security interest. The fact that the parties intended that title be reserved has no effect.

*Wegner*, 61 B.R. at 419 (quoting Anderson, *Uniform Commercial Code* 2–401:54). The Uniform Commercial Code has thus made the location of title immaterial to an analysis of secured transactions. *See In re Yale Express System*, 370 F.2d 433, 437 (2nd Cir.1966). The court in *Yale* reasoned:

> Since the Uniform Commercial Code has abolished the technical distinction between various security devices, the federal bankruptcy court should no longer feel compelled to engage in a purely theoretical exercise of locating 'title' nor should consideration of where 'title lies' influence the courts in the exercise of their equitable discretion.

*Id.* Accordingly, this court concludes that the agreement between the Debtors and Rohweder was a sales transaction rather than a lease in spite of the reservation of title in Rohweder.

■ As an installment sale financing arrangement the agreement was subject to the requirements of Chapter 41–09 (U.C.C. article 9). Section 41–09–03 (U.C.C. § 9–103) requires that a financing statement be filed to perfect a security interest. In this case Rohweder neglected to file a financing statement and is therefore an unsecured creditor. The unsecured creditors in the Debtors' Chapter 7 liquidation will receive nothing. Thus, by taking possession of the cattle Rohweder received more than he would have without the transfer in the liquidation.

■ The final issue raised by Rohweder regarding the preference claim is whether the parties rescinded the agreement before the Debtors filed their bankruptcy petition and whether such a rescission is a defense to a preference claim. There is no factual basis in the record in this case to conclude that a rescission occurred. Even if there were, however, the circumstances in this case would still indicate that the rescission itself was a preferential transfer. Section 101(50) of the Bankruptcy Code defines a transfer as "every mode, direct or indirect, absolute or conditional, voluntary or involuntary, of disposing of or parting with property or with an interest in property...." Two days before the bankruptcy filing the cattle were moved from the Debtors' possession to Rohweder's possession. This was a transfer under section 101(50). Before the transfer, as determined above, the Debtors owed an unsecured debt to Rohweder for the balance of the purchase price of the cattle. Thus the transfer was to a creditor on account of an antecedent debt. Finally, in a Chapter 7, but for the transfer, Rohweder would have received nothing as an unsecured creditor. The transfer enabled him to receive the cattle. Thus even if the agreement was rescinded the transfer of the cattle to Rohweder was still a preference.

2.

■ The other party claiming an ownership interest in the cattle is the Bank. The trustee asserts that the Bank's interest was unperfected as of the date of filing. Section 544 gives the trustee the hypothetical status of a judicial lien holder as of the date of filing. Thus if the Bank was unperfected at the time of filing the trustee primes the Bank. Section 41–09–40(1)(a) of the North Dakota Century Code (U.C.C. § 9–401) provides that a creditor must perfect a security interest in farm products by filing a financing statement with the county register of deeds. A security interest in inventory is perfected by filing a financing statement with the North Dakota Secretary of State. *See* N.D.Cent. Code § 41–09–40(1)(c) (1983). In the current case the Bank initially filed a financing statement covering the cattle with the register of deeds but not the secretary of state. The financing statement at the register of deeds was continued in May of 1985, well after Rohweder began leasing cattle. At the time of the continuation the Bank still did not file a financing statement with the secretary of state. The Bank eventually did file with the secretary of state, however, the filing came after the Debtors filed their bankruptcy petition and has no bearing on this case because the trustee's status as a hypothetical judicial lien creditor arises on the date the bankruptcy petition is filed. Thus the question becomes whether the cattle constituted inventory or farm products. Section 41–09–09 of the North Dakota Century Code (U.C.C. § 9–109), in part, provides:

Goods are:

    \*    \*    \*    \*    \*    \*

3. "Farm products" if they are ... livestock ... used or produced in farming operations ... and if they are in possession of a debtor engaged in raising, fattening, grazing, or other farming operations. If goods are farm products they are neither equipment nor inventory.

4. "Inventory" if they are held by a person who holds them for sale or lease....

The North Dakota Supreme Court has reasoned that "[t]he intrinsic nature of the goods does not classify them [for purposes of section 41–09–09]; rather, it is the use to which the owner puts the goods, or intends to put them that determines their classification." *Benson Co. Co-op Credit Union v. Central Livestock Association, Inc.,* 300 N.W.2d 236, 240 (N.D.1980). Thus when livestock is placed by a farm debtor into the hands of a marketing agent for sale it becomes inventory. *See United States v. Progressive Farmers Marketing Agency,* 788 F.2d 1327, 1329 (8th Cir.1986). The United States Court of Appeals for the Tenth Circuit has determined, in accord with the North Dakota court's decision in *Central Livestock,* that intent is dispositive with regard to classifications made pursuant to U.C.C. § 9–109. *See First State Bank v. Maxfield,* 485 F.2d 71, 74 (10th Cir.1973). In *Maxfield* the court concluded that certain cattle present on the Debtor's farm were inventory. The disputed cattle were not part of the farmer's cattle fattening operation. Rather he purchased them with the intent to immediately resell them as part of his secondary business as a cattle trader. *Id.* Official Comment No. 3 to U.C.C. § 9–109 provides that: "[w]hen an enterprise is engaged in the business of leasing a stock of products to users … that stock is also included within the definition of 'inventory.'"

In the instant case Rohweder was in the business of leasing dairy cows. In the transaction with the Debtor, as was determined in section 1, he was actually in the business of selling cows. The language of section 41–09–09(4) is clear that property which is held for sale or lease is inventory. Additionally, the statute requires that in order for property to be a farm product it must be in the possession of a debtor engaged in farming. N.D.Cent. Code § 41–09–09(3) (1983); *First Bank of North Dakota v. Pillsbury,* 801 F.2d 1036, 1038 (8th Cir.1986). Thus if the goods are not in the possession of the farm debtor they cannot be farm products. *See In re Walkington,* 62 B.R. 989, 993 (Bankr.W.D.Mich. 1986); *Garden City PCA v. Int'l Cattle Systems,* 32 U.C.C.Rep. 1207, 1209 (D.Kan.

1981). In the instant case the cattle were not in Rohweder's possession.

As support for its contention that the cattle were farm products the Bank cites the case of *Swift & Co. v. Jamestown Nat'l Bank,* 426 F.2d 1099 (8th Cir.1970). In *Swift* the court concluded that cattle were farm products because they were in the possession of a debtor who was fattening them for sale. *Id.* at 1102. Since the process of fattening cattle is expressly mentioned in U.C.C. § 9–109 as a farming activity, the court concluded that the cattle were farm products. *Id.* In the instant case Rohweder was not pursuing any farming activity with the cattle, instead he was leasing and selling the cattle to other farmers who used them for milk production. This court concludes that the cattle were inventory and the Bank did not properly perfect its security interest in inventory by a timely filing with the secretary of state. Thus the trustee, in his status as a hypothetical judicial lien creditor, primes the Bank's lien.

Accordingly, for the reasons stated, IT IS ORDERED that the trustee may recover the preferential transfer in the amount of $17,775.45 from Curtis Rohweder. IT IS FURTHER ORDERED that the security interest of the Security State Bank of Wishek is subordinate to the trustee's lien in the cattle.

LET JUDGMENT BE ENTERED ACCORDINGLY.